[Civ. No. 3970. Second Appellate District, Division One.—December 22, 1922.]

## SOUTHERN TRUST AND COMMERCE BANK (a Corporation), as Administrator, etc., Appellant, v. SAN DIEGO SAVINGS BANK (a Corporation), Respondent.

[1] BANKS AND BANKING—MISAPPROPRIATION OF FUNDS BY FIDUCIARY—LIABILITY OF BANK.—A bank may incur liability and be compelled to make good deposits that have been misappropriated by a fiduciary by violating its contract, express or implied, to pay the owner of the fund in strict conformity to the contract of deposit, or by appropriating the fund, with or without the fiduciary's consent, to the payment of the latter's debt to the bank, or by assisting the fiduciary to accomplish the misappropriation with knowledge, actual or constructive, that the fraud is being or about to be perpetrated.

[2] AGENCY—KNOWLEDGE OF PRINCIPAL—EXCEPTION.—To the general rule that a principal is presumed to have the same knowledge as his agent, there is an exception to the effect that where the agent has an interest adverse to that of his principal it will not be presumed that he has communicated his knowledge to the latter.

[3] BANKS AND BANKING—DEPOSITED TRUST FUNDS—MISAPPROPRIATION BY CASHIER—KNOWLEDGE OF BANK.—A bank is not chargeable with knowledge of the intention of its cashier to convert to his own use money on deposit belonging to an estate of which he is the guardian so as to make the bank liable to the estate for the misappropriation, where the bank occupied no fiduciary relation to the estate and received no benefit from the misappropriation and the money was deposited to and withdrawn from the personal account of the cashier in the ordinary course of business.

[4] ID.—CONDUCT OF CASHIER—INVESTIGATION BY BANK—LACK OF NEGLIGENCE—SUFFICIENCY OF EVIDENCE.—In this action to recover from a bank the amount of certain trust funds of an estate which were deposited therein by the cashier of the bank and subsequently misappropriated by him, the implied finding that the board of directors were not negligent in failing to make

1. Liability of bank for failure to prevent misappropriation of funds by a fiduciary, notes, 2 L. R. A. (N. S.) 993; L. R. A. 1915C, 518.

further investigation than they did of reports that the cashier was using liquor frequently and was interested in racehorses is supported by the evidence.

APPEAL from a judgment of the Superior Court of San Diego County. W. A. Sloane, Judge. Affirmed.

The facts are stated in the opinion of the court.

Glen H. Munkelt and Wright & McKee for Appellant.

Sweet, Stearns & Forward for Respondent.

CONREY, P. J.—Appeals from stated parts of a judgment of the superior court of San Diego County in an action to recover judgment for the amount of certain trust funds of an estate, which funds were deposited in defendant bank by one E. M. Barber, guardian of the estate.

The complaint is in twenty-one counts, but relates to only ten transactions. There are two counts for each transaction except one, which is set forth in three counts. The court gave judgment for the plaintiff on its first and second counts, and in favor of the defendant on all of the other counts. The plaintiff appeals from that part of the judgment which runs in favor of the defendant. There is also an appeal by the defendant, but counsel for defendant admit that the judgment against defendant should be affirmed, because it is conceded that the funds were, in that instance, paid to the defendant, at the time when they were embezzled by the guardian.

By its findings the court determined that on March 20, 1914, and for several years prior thereto, and until the month of May, 1916, E. M. Barber was cashier of the defendant bank; that as such cashier said Barber had exclusive charge of the tellers and clerks, and that all of said tellers and clerks took their orders from him as cashier; that as such cashier he had control and custody of the bank's money and accounts, subject to the direction of the president of the bank and the bank's board of directors, of which board the said Barber was a member; that from the seventh day of January, 1914, down to the month of May, 1916, said Barber was also the guardian of the person and estate of John Wood; that John Wood died on the second day of

May, 1917, and that the plaintiff is the duly appointed and qualified administrator of his estate. The specifications of insufficiency of the evidence to justify the findings of the court do not challenge any of the foregoing findings of fact.

Upon the third and fourth causes of action the court found, and there is now no contention to the contrary, "That on or about the 29th day of June, 1914, the said E. M. Barber received a certificate of deposit from the Farmers National Bank of Corning, Iowa, for the sum of $8271.12 payable to E. M. Barber, Gdn. That the funds represented by said certificate of deposit were the funds of John Wood. That the said E. M. Barber indorsed said certificate of deposit and placed the same to his personal credit with the defendant San Diego Savings Bank, and that said E. M. Barber deposited the said $8271.12 in his personal account with said defendant bank for the purpose and with the intention of embezzling, misappropriating and converting the said sum and the whole thereof to his own use and that the said sum was by said E. M. Barber embezzled, misappropriated and converted to his own use. . . . That the said sum of $8271.12 so deposited to the personal account of said E. M. Barber with the said defendant and so embezzled and converted to the use of said E. M. Barber has never been paid to said John Wood or to any one authorized to receive the same for him."

But the court further made the following findings, concerning which, and each of them, appellant specified and now contends that the evidence is insufficient to justify the same: "That it is not true that the said defendant San Diego Savings Bank with knowledge of the reasons and purposes for which said sum was deposited in the personal account of said E. M. Barber and with knowledge that said E. M. Barber intended to withdraw the said sum from his personal account for his own use and benefit, permitted the said E. M. Barber to withdraw the said sum of $8271.12 from his personal account and allowed the said sum to be converted to the uses of said E. M. Barber. But on the contrary the court finds that the said certificate of deposit was received in the usual course of business and was deposited by said E. M. Barber in the usual course of business of said bank and without any knowledge whatever on the part of said defendant bank and without any notice at all

on its part of the reasons or purposes for which the said sum was deposited in the personal account of said E. M. Barber and with no knowledge or notice that the said E. M. Barber intended to withdraw said sum for his own use or benefit. . . . That said defendant never had 'any knowledge that the same or any part thereof was embezzled or converted to the use of said E. M. Barber or was never paid to the said John Wood or to any one authorized to receive the same for him. That it is not true that the said sum of $8271.12 which was withdrawn as aforesaid or any part or portion thereof was used by said E. M. Barber to pay his indebtedness to the defendant San Diego Savings Bank or to pay any indebtedness of said E. M. Barber to said defendant, or that said defendant bank received any benefit whatever from the said sum of $8271.12 or from any part or portion thereof.''

On the remaining causes of action the findings of fact are similar to those last above set forth, with the exception that in some instances the moneys of John Wood received by Barber were deposited to an account in the name of E. M. Barber, guardian of John Wood; whereas, in the remaining instances, the money, in the form of checks or drafts to the order of E. M. Barber, guardian, was deposited to the personal account of Barber. Appellant contends that in the case of the Iowa certificate of deposit, and in certain other instances, respondent bank received the benefit of these moneys in this, that the trust funds were used to make good overdrafts of Barber on his personal account. It was shown that from time to time checks issued by Barber against his personal account, when the balance to his credit was not sufficient to meet them, were carried as cash for a week at a time (a little more or less) and not charged to his account until the account showed credits sufficient to meet them. But appellant was unable to prove, and the evidence does not show, the definite fact that at any time the funds of John Wood were used to meet any such deficit in Barber's bank account. The evidence, therefore, was sufficient to justify the court in its finding that the funds of John Wood were not used to pay any indebtedness of Barber to the defendant bank, other than in the one transaction wherein the court gave judgment in favor of the plaintiff.

Appellant does not contend any officer of the bank, other than Barber himself, had actual knowledge of his misuse of these trust funds. In other words, the bank was without knowledge of his misappropriation of the funds, and was without knowledge of his intention to misappropriate said funds, unless the fact that he himself was a director and was cashier of the bank, and had charge, custody and control of its money and accounts, as hereinbefore stated, is sufficient to charge the bank with knowledge of the dishonest intentions and acts of the said E. M. Barber concerning the funds received by him as guardian of the estate of John Wood.

[1] "There are three ways in which a bank may incur liability and be compelled to make good deposits that have been misappropriated by the fiduciary: (1) By a violation on its part of the contract, express or implied, between it and the owner of the fund. The reason for the bank's liability is based upon the general principle that the bank cannot discharge its obligation to a depositor except by payment in strict conformity to the contract of deposit. (2) By appropriating the fund, either with or without the fiduciary's consent, to the payment of the latter's debt to the bank. The reason for the bank's liability is based upon the general theory that the owner of a fund may follow it into the hands of and recover it from any person who has not innocently given value therefor. The action for money had and received is an appropriate form of action in this class of cases. (3) By assisting the fiduciary to accomplish the misappropriation, the bank having knowledge, actual or constructive, that the fraud is being or about to be perpetrated by the fiduciary. The reason for the bank's liability is that it knowingly makes itself a party to a fraud, and must make good the loss that results from the misappropriation." (L. R. A. 1915C, note p. 519.)

It is manifest that the defendant in this action is not liable under either one of the first two conditions last above stated. The bank paid the demands of the depositor on presentation of his checks, in strict conformity to the contract of deposit; and did not appropriate any of the trust money to the payment of Barber's indebtedness to the bank, except in the one instance to which we have referred. It only remains to determine whether or not the defendant,

by reason of Barber's knowledge of his own dishonest purposes at the time when he drew out the money from the bank, was chargeable with that knowledge, and thereby made itself a party to the fraud.

To put the matter concretely, let us take the item wherein it appears that Barber drew his check as guardian, payable to his own personal order, for five hundred dollars. He marked the check "Bard loan" (but there was no such loan) and drew out the money. Since it has not been accounted for in any other way, we may say at that very time he intended to and did embezzle that sum of five hundred dollars. As guardian he was not under obligation to keep the fund on deposit in the bank. In the ordinary course of business the bank was bound to honor his checks. If, on the stated facts, any liability exists, it must rest upon the theory that the bank itself was aware of the depositor's wrongful intention, and was, therefore, bound to withhold the payment to which otherwise he was entitled.

[2] To the general rule of law that a principal is presumed to have the same knowledge as his agent, counsel for appellant admits that there is an exception to the effect that where the agent has an interest adverse to that of his principal it will not be presumed that he has communicated his knowledge to his principal. No doubt that is the law. But counsel for appellant seek to apply to this case a limitation to that exception, which limitation is that where the principal is a corporation, the corporation is bound by the knowledge of its managing officer, even though such officer has an interest adverse to his principal, and that this is true where such managing officer is the only one acting for the corporation. In support of this contention they refer to *McKenney* v. *Ellsworth,* 165 Cal. 326 [132 Pac. 75]; *Williams* v. *Hasshagan,* 166 Cal. 386 [137 Pac. 9]; *National Bank of San Mateo* v. *Whitney,* 181 Cal. 202 [8 A. L. R. 298, 183 Pac. 789]. These decisions must be read in the light of the fact that in each case the matter involved was a financial transaction wherein the bank was a directly interested party. Thus in the McKenney case the president of the bank, and who conducted its affairs, held a note made to him by the defendant for seven thousand five hundred dollars. The payee transferred this note to the bank, for

value and before maturity, without indorsing on the note, or otherwise informing any other officer of the bank, that he had received from the defendant five thousand dollars to be applied on this note. Holding that the bank had notice of this defense, the court said: "The familiar rule that a principal is bound by the knowledge of his agent, acquired in the course of the agency, rests upon the presumption that the agent will communicate to the principal the facts learned by him, as it is his duty to do. But, says the appellant, where an agent of a corporation is dealing with the corporation in a transaction in his own behalf, it will not be presumed that he will communicate to his principal facts affecting the transaction. (*Bank* v. *Burgwyn,* 110 N. C. 267 [17 L. R. A. 326, 14 S. E. 623]; *McDonald* v. *Randall,* 139 Cal. 246 [72 Pac 997].) This is, no doubt, the general rule regarding the imputing to a principal of notice of facts known to an agent who is, in the particular transaction in question, acting in an interest adverse to that of his principal. But the rule is not without exceptions. If the agent is in fact acting for his principal in the transaction, even though he may have an opposing personal interest, 'it is his duty, notwithstanding his interest, to communicate to his company (principal) any facts in his possession, material to the transaction, and the law will therefore presume, in favor of third persons, that he made such communication.' (*Bank of Pittsburg* v. *Whitehead,* 36 Am. Dec. 186, note; *Le Duc* v. *Moore,* 111 N. C. 516 [15 S. E. 888].)"

[3] In the case at bar the defendant did not occupy any fiduciary relation to the estate of Wood. Defendant was simply the debtor of Barber as guardian, or of Barber personally, on a contract to pay him so much money on demand. The depositor's act of demanding and receiving the money from the bank might prepare him for committing the intended crime, but it was not a part of the act of embezzlement. When he applied to his own use the money so withdrawn, he ceased to act for the bank. The manner in which the guardian should keep his trust funds, or how he should dispose of them, were not matters in which the bank had any duty to investigate, or any interest to protect. Therefore, the knowledge which Barber had, of his own dis-

honest intentions or plans, was not knowledge which he would be presumed to have communicated to the defendant.

In that one transaction in this case wherein, as we have seen, the judgment is in favor of the plaintiff, the act of embezzlement consisted of the payment to defendant of funds of the estate of Wood, in satisfaction of indebtedness of Barber to the defendant. There the defendant is chargeable with knowledge of the facts known to the cashier, because in the unlawful act itself he represented the defendant. It therefore became his duty to the defendant, his principal in that transaction, to inform it that the money offered in payment to the bank was stolen money, and it will be presumed, in such case, that this duty was performed. On the other hand, in a transaction to which the bank is not a party, the bank officer does not owe to the bank any duty of communication, and the presumption that such communication has been made does not arise. In the matter now under consideration, the misconduct of E. M. Barber was a violation of his duty to the trust estate. It was that alone, and in it he alone was guilty. We have examined the decisions rendered in other jurisdictions, to which counsel refer. In nearly all of them the bank was a party in interest, which received a benefit from the misappropriation of the trust funds. This was so in *Lowndes* v. *City Nat. Bank,* 82 Conn. 8 [22 L. R. A. (N. S.) 408, 72 Atl. 151], from which counsel for appellant have quoted at great length. And even there the court was careful to point out that a bank does not undertake to supervise and safeguard a trust account, or to look after the appropriation of such funds when withdrawn. The liability there enforced was distinctly based upon the principle that ''a bank may not actively and knowingly participate in a misappropriation of trust funds. It may not become an active co-operating agency to that end, and, by such co-operation, directly contribute to the consummation of the wrong.''

[4] Finally it is contended by appellant that the defendant bank had constructive knowledge of Barber's misappropriations and is, therefore, liable. This point is based upon evidence proving that during the period of these defalcations, and for some time prior thereto, the said E. M. Barber had so conducted himself that he should have been an object of suspicion and investigation on the part of the

bank; that he was using liquor frequently, was interested in racehorses, and that thereby he had attracted the attention of at least two directors of the bank, and others, to the fact that he was unworthy the trust of bank cashier. That he had thus conducted himself is a fact about which there is no doubt. But it does not appear that these matters had been disregarded by the bank so far as they were brought to the attention of the officers. Mr. Gilmore, president of the bank, had noticed that some of Barber's checks were temporarily carried as cash items before they were entered against his account. "He would take the items up shortly after I spoke to him about them. It might be several days afterward." Gilmore denied that he had any suspicion that Barber was drinking; and never heard that he was in the habit of visiting saloons or was living beyond his means. He never followed up Barber's accounts. Mr. Sefton was vice-president of the bank and its principal stockholder. "I had not heard during these years that Mr. Barber was living beyond his means, playing the races, etc. No one had spoken to me about his living beyond his means or that he was playing the races. I heard rumors to the effect that he was drinking quite heavily. I also heard rumors to the effect that he was running around saloons a great deal, but I never saw him what I would consider under the influence of liquor. I heard one report to the effect that he was running with women." Mr. Sefton at one time became disturbed about these matters to such an extent that he employed a firm of detectives and had Barber "shadowed" night and day for a period of over thirty days. The result was that he received a report in detail showing that there was absolutely nothing that would justify the rumors. "I further at that time had three reports that had been made, one in regard to a woman, and two in regard to drinking, run down in detail, and they were found to be absolutely false." This was about the year 1914, which would be contemporaneous or prior to most of the dates covered by the present action. Said witnesses denied that during the time in question they ever heard of anything irregular in Barber's accounts.

In view of the foregoing evidence, the court was not bound to decide that the board of directors of respondent bank were negligent in the performance of their duties and

that but for such negligence Barber could not have carried out his embezzlements. Assuming, without deciding, that negligence on the part of the board of directors of the defendant bank in relation to the integrity of their cashier would have any force in supporting the claimed liability of the defendant bank in this case, we are not permitted here to assume that such negligence existed. The implied finding of the court is to the contrary, and that finding is supported by the evidence showing what was done by the officers upon whom the responsibility rested. They did use some care, and they did make some investigation. The fact that they did not investigate further and actually discover the facts which doubtless would have caused them to remove Barber from his position as cashier, proves an error of judgment. But it does not necessarily prove negligence. The president or directors of a moneyed institution are not required by law to adopt a system of espionage in relation to their officers. "Should any circumstance transpire to awaken a just suspicion of their want of integrity, and it be suffered to pass unheeded, a different rule would prevail if a loss ensued; but, without some fault on the part of the directors, amounting either to negligence or fraud, they cannot be liable." (*Briggs* v. *Spaulding,* 141 U. S. 132 [35 L. Ed. 662, 674, 11 Sup. Ct. Rep. 924, see, also, Rose's U. S. Notes].)

The judgment is affirmed.

Shaw, J., and James, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 19, 1923.

All the Justices concurred.