**CHILDS v. EMPIRE TRUST CO.**

No. 112.

Circuit Court of Appeals, Second Circuit.
Jan. 11, 1932.

Stuart McNamara, of New York City, for appellant.

Israel Akselrod, of New York City, for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

A petition of involuntary bankruptcy was filed against the bankrupt on September 26, 1928, and the court on the same day appointed one, Steinhardt, receiver, with power to continue the business for fifteen days. He qualified on the next day by filing a bond of three thousand dollars, and on October first received and deposited to his account as receiver in the respondent's bank a cheque for a little more than $10,000, from which on October second he drew out $9,500 by means of two cheques for $4,500 and $5,000. The proceeding is by the trustee summarily to compel the payment of the original deposit without allowing these as credits. Objection was taken in limine to the summary jurisdiction of the court and overruled; but, as the point was not argued and the assignment of errors does not raise it, we disregard it.

Steinhardt had been appointed receiver in a number of cases in which he used the bank as depositary, and was engaged in extensive defalcations of which this was only one. The avails of the two cheques, which he cashed at

the teller's window, he deposited at once with the bank in a "special" account in his own name, and withdrew before absconding. Eventually he killed himself and no part of the proceeds was recovered. The question is first, whether the payments were authorized at all, and, if so, whether the bank had enough notice to be charged with the defalcation. The trustee relies in part upon the form of the cheques. That for $5,000 was drawn to the order of "Joseph Wolf," on a printed form, which contained the words "For account of," just below the space where the amount was to be entered. Steinhardt wrote after these words the phrase, "interest payment due October 1, 1928." "Joseph Wolf" was a fictitious name used by Steinhardt as a cover for his thefts, and, as the originals of both cheques had been lost, it did not appear in whose hand the cheque had been indorsed, or indeed whether it had been indorsed at all. However, the bank's teller swore that his custom was to require some proof of the identity of an indorser, and there was no evidence that the circumstances in this instance were enough to excite suspicion as to the payee. It is true that the money was apparently paid to Steinhardt, but this did not necessarily charge the bank with notice that Wolf had not indorsed it, or that Steinhardt was not collecting it for him. The cheque for $4,500 was upon the same printed form and to Steinhardt's own order; in the same place where he had written the words just quoted upon the first, he wrote the words, "advances made on lien discharges Sept. 29/28—Payroll 9/23/28." No liens existed, and no pay roll was due on the date mentioned.

Besides the information conveyed by the cheques themselves, the trustee also relied upon Steinhardt's conduct in some of the other cases in which he was receiver and kept his accounts in the bank. It was his practice to make up his defalcations when the time came to account, by restoring money to the estates by' cheques upon his personal account, probably replenished by thefts from other accounts in the bank. Several times he procured statements of accounts out of due course; that is to say, although it was the bank's practice to make such statements only at the end of the month, he got them in mid month, and they contained only the balance for the day, without entry of earlier deposits and withdrawals. This probably facilitated the concealment of his thefts when he submitted the statements to the court, but the bank had no knowledge of his purposes.

■ The first question is whether General Order XXIX (11 USCA § 53) applies to receiver's accounts, for the cheques were signed by Steinhardt alone. It refers only to "moneys deposited as required by the act," and the only apt provision is section 47a (3), 11 USCA § 75 (a) (3), which requires trustees to deposit moneys in official depositaries. The order seems to refer only to this section, and leaves the deposits of receivers subject to such protection as the courts might prescribe. The whole act was drawn without forecast of the extraordinary part which the administration of receivers was to play, at least in the larger cities. The theory appears to have been that ordinarily the filing of a petition against a man would not interrupt his affairs; it was like any other pleading by which suit was commenced. Only upon adjudication was the control of the property to pass to the court. This is made plain by section 70a (11 USCA § 110 (a), under which title vests in the trustees as of the date of adjudication, a provision which has given the courts much trouble, and whose effect has been so circumscribed as to leave it little scope. That a man who did not mean to resist bankruptcy, and who was on the point of abandoning his property, should not file a voluntary petition, was apparently considered the exception. At any rate it seems clear that the order was not intended to cover receivers, and the uniform practice in the Southern district of New York until very recently was to require only the receiver's signature. Moreover, there is perhaps some à priori reason for distinguishing between receivers and trustees, based upon the more immediate supervision by the court over the first. We think that the general order did not apply.

■ The trustee argues, however, that, quite independently of this, the cheques were not within Steinhardt's powers as receiver; and it was on this point that he succeeded below. Ignoring for the moment the notations on the cheques, the question is merely whether a receiver has authority without special order to withdraw moneys once deposited in a bank to the account of his estate. We may assume arguendo, though it is by no means clear, that merely as receiver he has none; that he is only a custodian to collect the assets and hold them subject to the court's direction. Bankruptcy Act, § 48d (11 USCA § 76 (d); General Order XL (11 USCA § 53). Here he was more, for he was authorized to continue the business, and his duties were expressly enlarged under the general order. It is uncertain whether the bank had ever learned of this authority, but it nevertheless existed, and they may take advantage of it. There appears to be indeed some question whether a

receiver authorized to continue the business has authority to contract a debt. The contrary was held in Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 478, 479, 6 S. Ct. 809, 29 L. Ed. 963, but Cake v. Mohun, 164 U. S. 311, 316, 17 S. Ct. 100, 41 L. Ed. 447, ruled otherwise without notice of the first decision, and, at least as to current indebtedness, this is confirmed by some of the language in Chicago Deposit Vault Co. v. McNulta, 153 U. S. 554, 561, 14 S. Ct. 915, 38 L. Ed. 819. However, it is unnecessary for us to determine that question here. To justify payment of the cheque to Steinhardt's own order we certainly need not hold that a receiver may borrow. The occasions are numerous when he needs cash; there are pay rolls to meet and rent to pay as he goes along. It may be convenient to transfer some of the funds to another bank, or to keep substantial cash in his till. If he is to continue the business, it is proper to deposit his collections, but he cannot keep them all in bank and carry on; nor is it reasonable to require him to go to court every time he wishes to draw. The amount here was indeed large, but the bank could know nothing of the size of the business beyond the amount of the bond, which told very little; and besides it would be unreasonable to charge it with such supervision. The cheque to Wolf is more doubtful, but again there were reasonable possibilities which might justify the payment of $5,000 without recourse to the court. The continuance of the business involved more than the sale of the stock on hand; unless replenished it could not go on, and its good will, if it had any, must disappear. Ordinarily, it is kept alive so that just this may not happen. But this involves the purchase of more stock, and, if this is for cash, it is not necessary to go to a court for leave; the power to continue includes the power to make such purchases. Again, the supposititious Wolf might have been an assignee of the bankrupt's accounts, which would in that case be his; and while it would no doubt have been more prudent to require confirmation from a court, the payment was within a receiver's powers; just as he might deliver goods clearly shown not to belong to the bankrupt. A bank is not called upon to speculate as to such possibilities; it has no way of knowing the receiver's projects. Unless the deposit is locked against all withdrawals whatever, it need not, and indeed may not, inquire if there be no ground for suspicion. As well might a bailee refuse to deliver to a receiver on the ground that he had no power to change the custody of the goods. Its position is quite different from that of one with whom a receiver contracts, who is charged with knowledge of the limits of his authority. There is no inconvenience and no hardship in such cases, in requiring an order of court, which would be an intolerable burden for each cheque upon an account.

Nor do we think that the notations were notice of an abuse of this power. We may assume, if the bank was charged with them, that they showed that in part at any rate the payments were to meet claims due before the receivership, for which some order should have been forthcoming, though the last is not too plain. But we do not charge the bank with them at all. They were not conditions fixed upon the very order to pay, as in Irving Trust Co. v. Leff, 253 N. Y. 359, 171 N. E. 569; they were put upon the cheques apparently for the convenience of the receiver in his accounts and to identify the disbursements as between him and the creditors. We do not charge a bank teller with the duty of observing them and making any inferences; and in this we are confirmed by State Nat. Bank v. Dodge, 124 U. S. 333, 8 S. Ct. 521, 31 L. Ed. 458. In that case the prior dealings between the parties disclosed the meaning of the numbers put upon the cheques; and reflection would have shown that the withdrawals were not being properly allocated, and that the accounts were being depleted without warrant. See, also, Duckett v. Nat. Mechanics' Bank, 86 Md. 400, 38 A. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513. A bank's business must be done with dispatch; innumerable items pass before a teller in the course of a month. He is indeed charged with knowledge of his depositors' signatures and with the genuineness of the indorsements; but to demand of him a scrutiny of any notations upon them, and such conclusions as deliberation might require, would impose undue restrictions upon the fluidity of such business. Empire Trust Co. v. Cahan, 274 U. S. 473, 480, 47 S. Ct. 661, 71 L. Ed. 1158, 57 A. L. R. 921. We can see no more reason for this in the case of a receiver than in that of any one else. When he becomes a depositor, he accepts that relation; the court may impose such clogs on it as it chooses, but when by its order it does not, the bank may suppose that his business will be done in the usual way.

Nor was there any notice of malversation in making the cheque for $4,500 payable to Steinhardt himself. Havana R. R. Co. v. Central Trust Co., 204 F. 546, L. R. A. 1915B, 715 (C. C. A. 2). The trustee cannot

rely upon those cases which charge a bank, when it applies funds held by a trustee to the trustee's personal debt (Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585) ; the destination of these funds was not disclosed. Indeed it would appear that even if he had deposited the cheque in his own account, it would not have been notice (Whiting v. Hudson Trust Co., 234 N. Y. 394, 138 N. E. 33, 25 A. L. R. 1470), for we can see no difference between accepting such a cheque drawn upon another bank and upon the depositary itself. So far as we can learn, it has never been suggested that a fiduciary may not cash cheques to his own order. The same is true of those circumstances from which the trustee implies collateral notice. It would be impossible to do business with a fiduciary at all, if a bank were required to follow the cross entries between his several accounts; to decide whether he was thieving and then to dishonor his cheques. The bank is not a party to the administration of the estate; it undertakes no more than to pay upon the receiver's order; it must have such notice that its payment assists in his misconduct. Whiting v. Hudson Trust Co., 234 N. Y. 394, 403, 138 N. E. 33, 25 A. L. R. 1470, supra.

There remains only the question whether the payment of the cheque to Wolf was according to the tenor of the instrument. Section 28 (3) of the New York Negotiable Instruments Law (Consol. Laws, c. 38) covers the situation, unless, as the trustee argues, it does not apply to a case where the paper is drawn by an agent or fiduciary who is acting beyond his authority. No reason is apparent why this should be true, and the authorities do not countenance the exception. Bank v. Vagliano, L. R. (1891) A. C. 107; Norton v. City Bank & Trust Co., 294 F. 839 (C. C. A. 4); United States v. Chase Nat. Bank, 250 F. 105 (C. C. A. 2); Snyder v. Corn Exchange Bank, 221 Pa. 599, 70 A. 876, 128 Am. St. Rep. 780. So far as Shipman v. Bank of the State of New York, 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821, was not successfully distinguished in Phillips v. Mercantile Nat. Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596, it must be regarded as overruled. Unless there be some distinction in the case of agents of the United States—which we must own we cannot see—United States v. National Bank of Commerce, 205 F. 433 (C. C. A. 9), is not in accord with the established doctrine, and we cannot accept it.

Order reversed; petition dismissed.