[Civ. No. 13262.   First Dist., Div. Two.   May 28, 1947.]

BOSTON INSURANCE COMPANY (a Corporation), Appellant, v. WELLS FARGO BANK & UNION TRUST CO. (a Corporation) et al., Respondents.

Derby, Sharp, Quinby & Tweedt for Appellant.

Heller, Ehrman, White & McAuliffe and Harvey, Johnston & Baker for Respondents.

GOODELL, J.—This action was brought by the appellant against the respondent banks to recover $4,057.50 paid on a series of checks drawn against appellant's account in the Wells Fargo Bank, whereby appellant's funds were misappropriated. Respondents recovered judgment for their costs.

M. R. Wallace was the Pacific Coast manager of the marine department of appellant, and had been since 1933. Its cashier and accountant was L. W. Bruntlett. Appellant in 1938, lodged with Wells Fargo Bank a copy of a resolution authorizing its checks to be signed by M. R. Wallace and countersigned by L. W. Bruntlett or J. F. Fayen.

Wallace was interested in an oil venture in Kern County. It was a partnership composed of himself, his wife Freda G. Wallace, and one Charles Morris, and operated under the name Freda G. Oil Company.

The thirteen transactions in question were spread over the period from April 4 to August 9, 1940, and in each of them the *modus operandi* was as follows: Morris, on the ground in Kern County, in need of money wherewith to operate, would draw a draft signed either in his name or Freda G. Oil Company by himself, through the State Bank of Taft (now Kern County Bank) for the amount needed. The Taft bank would send the draft to its San Francisco correspondent, the Wells Fargo Bank, for collection, which bank incidentally happened to be the depositary of Boston. On receipt of the draft Wells Fargo would send it by messenger to the office of Boston Insurance Company and leave it with Bruntlett who would receipt for it. Later that day, or the next, the messenger would return and Bruntlett would give him the check of Boston drawn on Wells Fargo Bank and payable to Wells Fargo Bank, for the amount of the draft, whereupon the latter bank would credit the drawer bank at Taft for the amount of the draft and notify it that the draft had been paid, debiting, at the same time, the account of Boston in Wells Fargo.

Twelve drafts were drawn in the following fashion:

> "M. R. Wallace
> To Boston Ins. Co.
> 340 Pine St.
> San Francisco, Cal."

The other was drawn:

"M. R. Wallace
To 340 Pine
Boston Ins. Co.
San Francisco, Cal."

All thirteen checks were signed by Wallace. Twelve of them were countersigned by Bruntlett and the other by Fayen.

The thirteen drafts and the corresponding checks were for varying amounts ranging from as low as $35 to as high as $1,000, aggregating the $4,057.50 in suit.

Admittedly Boston Insurance Company had no interest in the Freda G. Oil Company, and Wallace had never been given permission to use appellant's funds in that venture. However, neither bank knew this.

The appellant's first contention is that "One who participates in a breach of trust is liable to the beneficiary for the damages resulting from the breach." Respondents do not challenge this general statement of principle, but they deny that there was such participation as to fasten liability on them.

The appellant contends that because the drafts were drawn on Wallace personally and were paid by checks of Boston Insurance Company, the Wells Fargo Bank was put on notice as matter of law that its depositor's funds were being diverted by Wallace for his own uses and purposes and that, accordingly, it took part in the diversion. In other words, it is claimed that the face and form of the drafts plus the face and form of the checks gave the Wells Fargo Bank constructive notice of the misappropriation, which it should have followed up.

■ Whether the bank had notice or was put on inquiry is a question of fact, not one of law. *Northwestern Portland Cement Co.* v. *Atlantic Portland Cement Co.*, 174 Cal. 308, 312 [163 P. 47]; *West* v. *Great Western etc. Co.*, 36 Cal. App.2d 403 [97 P.2d 1014]; *People* v. *One 1933 Buick Sedan*, 43 Cal.App.2d 482 [111 P.2d 378]; 20 Cal.Jur. p. 240. In *National Bank of San Mateo* v. *Whitney*, 181 Cal. 202, 210 [183 P. 789, 8 A.L.R. 298] it is said, "The question as to whether the suspicions of the defendant were or should have been aroused was a question of fact for the jury."

The court found not only that the Wells Fargo Bank had no such notice, but it went further and found that appellant

caused the checks to be delivered to the bank with the intent of engendering the belief that the drafts were for appellant's own obligations, were authorized by it, and that by appellant's conduct the bank was led to believe that the drafts were drawn upon appellant itself. In this connection it must be remembered that the drafts were delivered by the bank's messenger not to Wallace but to Bruntlett, the insurance company's cashier, and it was Bruntlett and not Wallace who delivered the appellant's checks when the messenger returned for them. The form in which twelve of the thirteen drafts were drawn, with "Boston Ins. Co." appearing on the same line with, and following, the word "To" was, to say the least, equivocal and, whether or not it was designed to mislead the bank into concluding that Boston instead of Wallace was the drawee, it certainly had a tendency to do so. To say the least, appellant's name was coupled with Wallace's in the drawee part of the drafts. Moreover the record shows that "every day in the week" the Wells Fargo bank handled a draft on the appellant although not "directly chargeable against their account." In addition to these circumstances, Bruntlett, and in one case Fayen, neither of whom was interested in Freda G. Oil Company and both of whom were connected with appellant, countersigned the checks.

Appellant claims that the case of *Lynch* v. *Wells Fargo etc. Co.*, 114 Cal.App. 565 [300 P. 74], is directly in point. That was not a case such as this is, where an agent, authorized to sign his principal's checks, diverted their proceeds to his own use. There the checks, signed by authorized persons, were used for precisely the purpose which the principal intended, namely, to pay off the principal's overdraft. The trouble was that the fund on which the checks were drawn was a trust fund, known by the bank to be such. The reason why the bank was held liable was that, with such knowledge, it "cashed and received the proceeds at its risk" (as appears from the opinion, p. 574). See, also, 9 Corpus Juris Secundum page 713, section 353, where the Lynch case is cited as a representative California case under this rule.

Appellant relies also on *Southern Trust & Commerce Bank* v. *San Diego Savings Bank*, 60 Cal.App. 215 [212 P. 385], where the cashier of the defendant bank was at the same time guardian of an estate. He received a check for $8,271.12, and other checks, payable to himself as guardian, deposited them in his personal account in the same bank and drew

against the latter account for his own uses. There were ten separate transactions sued on. In nine of them the bank was held not liable, because the checks were drawn to payees other than the bank. In one transaction the bank was held liable because the guardian drew the check on trust funds, known by the defendant bank to be such, in payment of his personal overdraft, the bank thereby becoming an active participant in the diversion, as in the Lynch case, and being held liable for the self-same reason. The court, quoting Lawyers Reports Annotated 1915C, note page 519, stated: ''The reason for the bank's liability is that it knowingly makes itself a party to a fraud, and must make good the loss that results from the misappropriation.'' With respect to the other nine transactions, where the checks were paid to others, the court said, page 221: ''The manner in which the guardian should keep his trust funds, or how he should dispose of them, were not matters in which the bank had any duty to investigate, or any interest to protect.'' In cases where the bank receives money out of an earmarked trust fund in its own bank it *knows* the money is being applied to the trustee's personal use, and takes part in so applying it.

*Keeney* v. *Bank of Italy,* 33 Cal.App. 515 [165 P. 735], also relied on by appellant, was simply a case where the bank appropriated, by virtue of its banker's lien, $1,968.66 from an account clearly earmarked as a trustee account, in satisfaction of an indebtedness personally owing to it by the person who happened to be the trustee. In the Keeney case the court states the California rule on this subject. The concluding phrase points out the broad distinction which the appellant's cases so well illustrate. At page 518 the court says: ''It is not contended by respondent, nor could it well be in the light of the later decisions, that if the defendant had paid out to third parties the funds here in question upon checks regularly drawn upon the account, it could be held accountable for them, for under such a state of facts no duty is cast upon the bank to inquire into the purpose for which the funds are being used (*United States Fidelity & G. Co.* v. *First Nat. Bank of Monrovia,* 18 Cal.App. 437, [123 P. 352]; *Interstate Nat. Bank* v. *Claxton,* 97 Tex. 569, [104 Am.St.Rep. 885, 65 L.R.A. 820, 80 S.W. 604]; *Silisbee State Bank* v. *French Market G. Co.,* 103 Tex. 629, [34 L.R.A. (N.S.) 1207; 132 S.W. 465]; but the cases draw a clear distinction between such payments and an appropriation by the

depositary of the fund in payment of its own claim against the trustee or agent.''

In *United States F. & G. Co.* v. *First National Bank of Monrovia*, 18 Cal.App. 437 [123 P. 352], cited in the foregoing quotation, a case quite similar to the Southern Trust case, the court in rejecting the contention that the bank was obligated to investigate the purpose for which a guardian drew against his account, said: ''Appellant's contention, if accepted as applicable to the facts presented, would render banks *ex-officio* trustees in general for all *cestuis que trust*.''

All the authorities thus far discussed are cases where the bank accounts were clearly earmarked as trust funds, and we have seen what the rule is in California on that subject. The instant case, however, involves an ordinary commercial account of a corporation where its officers or agents (fiduciaries in the broad sense) are authorized to sign its checks. If the rule respecting a definitely earmarked trustee account is as we have found it to be, it would seem that the rule should be no stricter, but perhaps less strict, respecting an account such as we have in this case. This question was considered in the case of *Empire Trust Co.* v. *Cahan*, 274 U.S. 473 [47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921]. There it was held by the lower courts that because of the form of the checks the bank was chargeable with notice *as matter of law* that the agent was not acting in his principal's interest. In reversing the judgment the court said: ''We do not perceive on what ground the petitioner could be held bound to assume that checks thus lawfully drawn were required to be held or used for one purpose rather than another. In the case of checks drawn by a corporation not likely to disburse except for corporate purposes there might be stronger reasons for requiring a bank to be on its guard if an officer having power to draw them deposited checks for considerable sums to his private account; but it recently has been held otherwise by the judicial committee of the privy council. *Corporation Agencies* v. *Home Bank* [1927] A.C. 318. . . .''· The court then draws an analogy between that case—where the agent, holding a power of attorney, diverted his principal's funds in an ordinary bank account—and one involving an earmarked trust fund, as follows: ''The petitioner [bank] in permitting the son to draw out the money was permitting only what it, like the respondent's banks, would have been bound to allow *even if the deposit had been earmarked as a trust*. The form in which the withdrawals took place does

not appear. They might have been, like the deposits, in checks to the son's own order. All that is known is that the respondent did not get the benefit of them.'' (Emphasis added.)

█ It is not necessary to decide whether a commercial account is subject to the same rules as apply to an earmarked trust fund for here we have a statute which removes all doubt as to the obligation resting on the bank. Section 16a of the Bank Act (Stats. 1925, p. 513) reads as follows: ''Whenever any person, firm or corporation being the owner of any deposit account subject to check in any bank . . . shall have authorized any person as agent or officer of said person, firm or corporation to draw checks on such bank against said account, the bank, in the absence of written notice to the contrary, shall be justified in presuming that any check drawn by said agent or officer in the form or manner authorized by such principal, including checks drawn to personal order of agent or officer, was drawn for a purpose authorized by the principal and within the scope of the authority conferred upon the agent or officer.''

The appellant argues that this ''provision seems not to have been discussed in any reported decision and did not replace or amend any similar provision which might shed light on its history and purpose. Its interpretation is therefore a matter of some difficulty, especially since the language of the section is not free from ambiguity.'' Appellant argues further that the transaction in the Lynch case arose after section 16a was adopted and that the ''opinion does not discuss Section 16a, but presumably it was considered by the Court.'' The court had no occasion to consider it. Section 16a deals only with the drawing of checks, and there is nothing in that section which could have had any bearing on the Lynch case transaction. In that case it appears clearly from the depositor's letter to the bank of February 20, 1925, that the depositor was ''holding in trust certain funds in the sum of $25,000'' which it was then depositing in a ''Special Account'' ''not subject to be drawn against in our usual course of business.'' That earmarked fund *was* drawn against to reduce the depositor's overdraft, hence the bank was held liable as a participant under the rule discussed earlier. The Lynch case involved no question (as does this case) of the signers of the check going outside their authority, for there the checks were applied exactly as the depositor intended, namely, in payment of its overdraft.

█

We find no difficulty in the interpretation of section 16a nor any ambiguity therein.

■ Under the provision of section 16a that the bank shall be justified in presuming that *checks drawn to personal order of agent or officer are authorized,* Wallace (assuming he had an authorized countersignature) could have drawn any or all of these checks payable to himself, cashed them in currency, and met the drafts therewith. Regardless of whatever suspicion might have lurked in the mind of the teller as to the destination of the proceeds, no duty of inquiry would have been cast on the bank.

The thirteen checks in question were drawn at different times to pay thirteen drafts for $35; $220; $650; $215; $325; $450; $200; $50; $1,000; $350; $400; $122.50 and $40 respectively. They were admittedly signed by authorized agents of appellant. The drafts were presented from time to time by a bank messenger and when, the same day or the next, he returned and was given a check which matched to a cent the amount called for by the draft there could be no question that the bank was being told what the check was for. As each check was delivered to the bank it was accompanied by the presumption, created by section 16a, that such check, designed to pay the draft then in the bank's hands, "was drawn for a purpose authorized by the principal and within the scope of the authority conferred upon the agent or officer."

Section 16a deals with the drawing of checks, and with nothing else. It does not touch the *endorsement* of checks, and for that reason cases such as *Palo Alto etc. Assn.* v. *First Nat. Bank,* 33 Cal.App. 214 [164 P. 1124] and *Buena Vista Oil Co.* v. *Park Bank of Los Angeles,* 39 Cal.App. 710 [180 P. 12] have no bearing on the case. The section provides that the presumption prevails "in the absence of written notice to the contrary," and appellant argues that the drafts drawn on Wallace, personally, supplied such written notice. We are unable to agree with appellant in this contention. The drafts of course were in writing but they were not sufficient to destroy or weaken the presumption which went with each check. To hold that they were sufficient, would render the statute meaningless.

Appellant's second point is that as the checks were payable to the Wells Fargo Bank itself, the bank could do nothing but hold them for instructions from appellant as to their application. This is somewhat theoretical in view of the

circumstances under which the checks were issued, having been drawn for exactly the dollars and cents called for by the drafts then in the hands of the bank.

Finally it is argued that as the checks provided on their face for a specification of the purpose for which they were drawn, and as none of them contained anything in this space, the absence of such notations put the bank on notice. The general rule, however, as stated in 9 Corpus Juris Secundum page 677, section 332 is that ''Generally the bank is not required to take notice of any notation or memorandum on the check appearing on the margin thereof made for the convenience or benefit of the maker, with respect to honoring such check or so as to restrict the banks' right to charge the maker's account with the amount thereof.'' See, also, *Childs* v. *Empire Trust Co.*, 54 F.2d 981, 983, citing *State Nat. Bank* v. *Dodge*, 124 U.S. 333 [8 S.Ct. 521, 31 L.Ed. 458]; *First Nat. Bank* v. *School District*, 173 Minn. 383 [217 N.W. 366, 367, 56 A.L.R. 1369]; *Valley Nat. Bank* v. *American Employers Ins. Co.*, 60 Ariz. 407 [138 P.2d 294].

We are satisfied, as already indicated, that the trial court properly held that the Wells Fargo Bank was subject to no liability in this case. It follows that the Kern County Bank is likewise free from liability.

A large number of authorities from outside jurisdictions are relied on by appellant. In view of the fact that in such other jurisdictions there is no statute similar to section 16a, there is no need to discuss these outside cases. In *Empire Trust Co.* v. *Cahan, supra,* the court said: ''The person reposing confidence in the son was not the petitioner but the respondent (*National Safe Deposit Sav. & T. Co.* v. *Hibbs,* 229 U.S. 391, 397, 57 L.Ed. 1241, 1247, 33 Sup.Ct.Rep. 818).'' So in this case, ''under familiar principles of law 'where one of two innocent persons must suffer by the fraud or negligence of a third, whichever of the two has accredited him ought to bear the loss' (*National Bank of San Mateo* v. *Whitney, supra,* at page 205).'' (*Condor Corp.* v. *Cunningham,* 71 Cal.App.2d 25, 33 [162 P.2d 21].)

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied June 27, 1947, and appellant's petition for a hearing by the Supreme Court was denied July 22, 1947.