[Civ. Nos. 31241, 31259.   Second Dist., Div. Two.   Aug. 23, 1968]

DÈSERT BERMUDA PROPERTIES et al., Plaintiffs, Cross-defendants and Appellants, v. UNION BANK, Defendant, Cross-complainant and Appellant; EUGENE J. WEINBERGER, Cross-complainant, Cross-defendant and Appellant.

Loeb & Loeb and Robert A. Holtzman for Defendant, Cross-complainant and Appellant.

Pacht, Ross, Warne, Bernhard & Sears, Henry J. Shames, Conrad L. Klein, and Ira H. Lurvey for Cross-complainant, Cross-defendant and Appellant.

Milo V. Olson for Plaintiffs, Cross-defendants and Appellants.

FLEMING, J.—Desert Bermuda Properties and Southern California Aircraft Corporation (collectively hereafter Desert Bermuda) sued Union Bank for trust funds wrongfully used. Union Bank cross-complained against Eugene Weinberger, and Weinberger in turn cross-complained back against Desert Bermuda. From a summary judgment for $27,471 in favor of Desert Bermuda, Bank appeals. From the computation of interest on the judgment, Desert Bermuda appeals. From the judgment as it affects him, Weinberger appeals.

Desert Bermuda's complaint alleged:

On 4 April 1961 Desert Bermuda sold to Serdon Developments, Inc. (hereafter Serdon) its interest in certain aircraft equipment and a lease at Ontario International Airport, and entered a sublease with Serdon.

To assure payment of the purchase price and of the rent under the sublease, Serdon by letter promised Desert Ber-

.muda to deposit 85 percent of the receipts from the sale of the aircraft equipment in a special account at Bank.

Serdon defaulted in its payments to Desert Bermuda.

Serdon's president, Fraser, on 7 August 1961 informed Desert Bermuda that $24,000 from Serdon's sale of aircraft equipment was on deposit at Bank, that the officers and directors of Serdon were about to disburse these funds in violation of Serdon's promise to hold them for Desert Bermuda.

Desert Bermuda notified Bank by letter of 8 August of Serdon's promise, and claimed equitable ownership of the money in Serdon's account.

On 4 April 1961, Messrs. Weinberger, Gardner, Hester, Van Woerkom, and Fraser had personally borrowed $100,000 from Bank and given Bank a joint promissory note.

On 7 August 1961 Bank received a check drawn on Serdon's account for $23,500, which it applied on the principal of the $100,000 joint promissory note.

After receiving Desert Bermuda's letter of 8 August, Bank, "to aid and abet the individual officers of Serdon to wrongfully use the funds," voided the check of 7 August and returned the funds to the account. Bank caused Hester and Gardner to write a new check on the account payable to themselves and to endorse this check to Bank. The new check, although dated 7 August, was actually written on or after 9 August.

On 15 August 1961, Desert Bermuda sued Serdon for $350,000.

Bank's answer admitted the $100,000 loan, the receipt of Desert Bermuda's letter of 8 August, the receipt of the first Serdon check, the return of the first check to Weinberger and Gardner, and the replacement of the first check by a second check from Serdon. Bank affirmatively pleaded the bar of the statute of limitation and the benefit of a release given the officers and directors of Serdon by Desert Bermuda.

Both parties moved for summary judgment.

· In support of its motion, Desert Bermuda submitted a declaration of Fraser, stating:

On 7 August, the Serdon account had a balance of $24,000.

On 4 August, Fraser telephoned Siegel, Bank's vice president, and said that funds in the account should be left intact because of an escrow involving the sale of Serdon and because the funds equitably belonged to Desert Bermuda. Siegel replied he could not accept this information from Fraser, but would rely on Weinberger and Gardner.

Hester and Gardner were authorized signators on the account; no checks were authorized without Hester's signature.

Checks amounting to $24,000 were drawn by Serdon in favor of Bank and applied against the joint promissory note, but these first checks were signed by Weinberger and Gardner, not by Hester.

These checks were later voided, and new Serdon checks, signed by Hester and Gardner were drawn in favor of Hester and Gardner and endorsed by them to Bank.

Bank submitted declarations of Siegel and its counsel to the following effect:

Siegel had no recollection of any conversation with Fraser on 4 August, and he was confident that if such a conversation had taken place he would remember it.

Siegel received Desert Bermuda's letter of 8 August on 9 August, but Bank could not dishonor a depositor's check solely on the strength of a letter from a lawyer.

That same day Siegel noted that the first Serdon checks were not signed by Hester. He called Weinberger and told him prompt delivery of properly signed checks would permit the bank's entries to remain undisturbed. Under Bank policy corporate checks would not be accepted in payment of individual indebtedness of corporate officers to Bank, unless made out to them individually and endorsed by them in favor of Bank. Siegel requested that new checks be drawn to comply with Bank policy.

Bank's only knowledge of the relationship between Serdon and Desert Bermuda, other than Desert Bermuda's letter of 8 August, was awareness that the individual borrowers of $100,000 had apparently lent the borrowed money to Serdon by paying it by cashier's check to Desert Bermuda for Serdon's purchase of facilities at Ontario International Airport.

Serdon's account with Bank was an ordinary commercial account, without special designation, which had been used for numerous routine transactions, including payment of interest on the $100,000 joint promissory note on 3 May, 2 June, and 30 June 1961; so far as Bank knew Serdon's funds were ordinary business funds. Bank had never been advised of any agreement between Serdon and Desert Bermuda to maintain a special account with Bank.

In seeking to reverse the summary judgment in favor of Desert Bermuda, Bank contends, among other things, that the

judgment did not take into account section 952, Financial Code, which, in relevant part, provides: "Notice to any bank of an adverse claim . . . to a deposit . . . may be disregarded until and unless the adverse claimant shall [obtain a court order, or give a bond, or deliver an affidavit of fiduciary relationship] . . . The provisions of this section shall be applicable even though the name of [the account holder] . . . is modified by a qualifying or descriptive term such as 'agent,' 'trustee,' . . . indicating that such person may not be the owner in his own right of the deposit . . ." Desert Bermuda, clearly an adverse claimant within the meaning of section 952, never obtained a court order directed against Bank, nor did it deliver a bond to indemnify Bank against loss, nor did it deliver an affidavit setting forth a claim of fiduciary relationship. Accordingly, Bank argues it was entitled to disregard Desert Bermuda's claims.

Desert Bermuda concedes that if the checks had been issued to satisfy claims of strangers to the account, Bank could have honored the checks and disregarded the demands of adverse claimants and in so doing would have been protected by section 952. But, it argues, Bank could not rely on the statute to protect its use of these funds to satisfy its own claims, because (a) it knew that corporate officers could not use corporate funds to satisfy their personal indebtedness, and (b) section 952 does not apply when a bank obtains or appropriates moneys on deposit in order to satisfy the depositor's indebtedness to it.

▇ The first argument is refuted by section 953, Financial Code: "When the depositor of a commercial or savings account has authorized any person to make withdrawals . . . the bank, in the absence of written notice otherwise, may assume that any check, . . . drawn by such person in the authorized form . . . including checks drawn to his personal order and withdrawal orders payable to him personally, was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person." Bank was not required to inquire into the financial relationship of Serdon and its officers and directors acting within the scope of their conferred authority until Bank received notice that the authority had been revoked or Bank officially learned that authorization never existed. Under the statute it is clear Bank was entitled to recognize the authority of Serdon's officers to write checks payable to themselves and to use those checks to satisfy their own obligations. We see no reason to

distinguish between the authority of officers to draw on an account for the ultimate benefit of outside creditors and their authority to draw on the account to satisfy indebtedness owed the bank itself. (See *Boston Ins. Co.* v. *Wells Fargo Bank,* 80 Cal.App.2d 59 [181 P.2d 84].) In both cases Bank could continue to recognize the authority of Serdon's officers to draw on its bank account for whatever purposes they chose.

We need not rest our decision entirely on the authority of this general rule, however, for in the case at bench the facts themselves strongly suggest the fitness and propriety of payments from the Serdon account on the individual promissory note held by Bank. It appeared to Bank, and on the record it appears to us, that the indebtedness under the individual promissory note was assumed for corporate purposes, that the officers and directors of Serdon had lent their individual credit for Serdon's benefit, that Serdon had in fact received the entire proceeds of the loan, an appearance fortified by the transmission of the $100,000 by Bank's cashier's check to Desert Bermuda and by the periodic payment of interest on the $100,000 note from Serdon's account. Every fact known to Bank suggested that Serdon, in making payment on the promissory note, was using corporate funds for corporate purposes.

Desert Bermuda's second argument—that although Bank may safely honor checks drawn by the depositor for the benefit of strangers from an account against which there are adverse claims, it must recognize the existence of adverse claims to the account when Bank furthers its own interests as a creditor, regardless of compliance with section 952—derives from *Lynch* v. *Wells Fargo Bank & Union Trust Co.,* 114 Cal.App. 565 (June 1931) [300 P. 74], and *Keeney* v. *Bank of Italy,* 33 Cal.App. 515 [165 P. 735] (1917).

In evaluating this argument we observe, first of all, that the two cases on which Desert Bermuda relies were decided prior to the adoption in August 1931 of what is now Financial Code section 952. Before that date considerable responsibilty rested on a bank to police accounts of depositors who were known to be acting in some fiduciary capacity. It may well be that this duty was particularly stringent when the bank's own dealings with the depositor were involved. (*Southern Trust & Commerce Bank* v. *San Diego Sav. Bank,* 60 Cal.App. 215 [212 P. 385].) But when the Legislature adopted what is now Financial Code, section 952, it relieved banks from any

general duty to police fiduciary accounts (a duty which a bank could not reasonably be expected to carry out effectively). In 1941 the protection of the statute was further broadened by an amendment applying its provisions to accounts carrying a specific qualifying designation, such as agent or trustee. Clearly, we are entitled to take Financial Code, section 952, at full face value without qualifying judicial interpretation.

Yet even if we disregard the implications of earlier judicial decisions followed by later statutory enactment, *Lynch* and *Keeney* do not support the use to which Desert Bermuda attempts to put them. By no means do these cases hold that a bank is prohibited from satisfying its own claims against moneys on deposit merely because of unsworn third-party claims to the deposit. Rather, they determine that a bank which knows that moneys on deposit belong to someone other than the named depositor cannot appropriate those moneys to satisfy its own claims against the depositor. In *Lynch* the account itself had been designated a Special Account, and at the time the account had been opened the bank was advised by letter that the moneys in the account were held by the depositor in trust for Lynch and subject to withdrawal only on the signatures of the depositor and Lynch. When the bank later permitted the depositor to use funds in this special account to satisfy its overdrafts with the bank, the bank was charged with the knowledge of the trust and became liable to Lynch.

In *Keeney* the depositor carried an account with the bank under the designation, H. P. Platt, Trustee. At a time Platt was indebted to the bank, the latter under its banker's lien appropriated moneys in the account to satisfy Platt's debt. In holding the bank liable to the true owner of the moneys in the account, the court declared the bank was under a duty to inquire about the rights of third persons in the account, and was chargeable with constructive notice of the equitable right of the true owners. Two points in *Keeney* distinguish it from the case at bench: first, the account itself designated the depositor as a trustee; second, the bank exercised its banker's lien on its own initiative without securing the authorization of the depositor to apply the funds to the account against his indebtedness. By contrast in the present case, the Serdon account contained no restrictive characterization, and Bank obtained the funds in the account as a result of the order of the depositor and not as a result of its own act.

Thus it may be seen that in both *Lynch* and *Keeney* the bank was put on specific notice that the account involved was a special account. In both cases the bank had knowledge imparted to it by its depositor of the trust nature of the account. But in the case at bench knowledge of the trust nature of the account, if such was a fact, was not made known to Bank in any appropriate or official manner. Consequently Bank was not required to recognize an unsubstantiated demand of an adverse claimant which failed to comply with section 952, and Bank, in the absence of specific knowledge of third-party ownership of the funds on deposit, could proceed to satisfy claims of its own against the depositor, either with or without the depositor's consent. ■ While we recognize that a bank possessing actual knowledge of equitable ownership of one of its deposits by someone other than the named depositor may be required to subordinate its own claims to the rights of the equitable owner, even though compliance with section 952 is lacking, in the case at bench evidence of a valid third-party interest in the moneys on deposit was incomplete, evidence of any authorized instruction by depositor to Bank to recognize such an interest was conflicting, and evidence of Bank's knowledge of third-party ownership of the funds was entirely lacking. Unresolved issues of fact involving derivation of funds, authorization to Bank, and knowledge of Bank, made summary judgment inappropriate.

The judgment in favor of Desert Bermuda must be set aside. Desert Bermuda's appeal on the question of interest on that judgment has accordingly become academic.

## II

In a separate lawsuit Desert Bermuda obtained a judgment against Serdon and its officers, including Weinberger, for $539,401. On payment by Weinberger of $150,000, Desert Bermuda released him from further liability, but reserved its rights against the other judgment debtors. Desert Bermuda's present suit against Bank is based on the fact that the judgment against Serdon and its officers has been only partially satisfied.

Bank cross-complained against Weinberger and other Serdon officers, pleading that if judgment went against Bank, cross-defendants, including Weinberger, should repay the amount of the judgment to Bank. Weinberger answered, denying any indebtedness to Bank and denying any improper use of Serdon funds. Weinberger then himself cross-

complained against Desert Bermuda, pleading that Desert Bermuda knew its action against Bank would cause Bank to seek recovery from Weinberger, that such recovery would violate Weinberger's release from further liability by Desert Bermuda, and therefore Weinberger should recover judgment against Desert Bermuda for any judgment entered against him by Bank.

In the light of our disposition of the summary judgment of Desert Bermuda against Bank, Weinberger's contentions on appeal are moot.

The judgment is reversed. The appeals of Desert Bermuda and Weinberger are dismissed as moot.

Union Bank to recover its costs on appeal from Desert Bermuda.

Roth, P. J., concurred.

HERNDON, J.—I concur in the judgment. I agree that ''[u]nresolved issues of fact involving derivation of funds, authorization to Bank, and knowledge of Bank, made summary judgment inappropriate.'' However, I am concerned that the extended discussion of the essentially irrelevant sections 952 and 953 of the Financial Code contained in the majority opinion may mislead the lower court in its conduct of further proceedings.

Sections 952 and 953 were designed to establish rules governing the rights and duties of *a depository bank in its handling* of the myriad drafts drawn daily by its depositors. These sections in no way pertain to the rights of *the transferees of the funds represented by these drafts,* whether they be third parties or the bank itself. The trial court had no reason to consider these sections in passing upon respondents' motion for summary judgment, nor will it have any reason to consider them in any further proceedings on the merits, since they are inapplicable to the issues raised by respondents' complaint.

Basically, respondents' action is one brought under Civil Code section 2243 which provides: ''Everyone to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, unless he purchased it in good faith, and for a valuable consideration.'' In determining such an action it is quite immaterial whether or not some intermediary between the transferor and the transferee,

such as a depository bank, acted properly or improperly in the premises.[1]

In the usual case A, a trustee, wrongfully draws a draft on trust funds on deposit in B bank to pay his personal obligation to C. C may not retain these funds against the claim of the beneficiary of the trust if (1) prior to their receipt he had received notice of the beneficiary's rights; or (2) he gave no consideration therefor. C's right to retain the funds is neither increased nor diminished by the fact that a separate cause of action exists, or does not exist, against B bank for its actions in connection with the transfer.

If C gave valuable consideration for the transfer, without prior notice of the beneficiary's claim, he may retain the proceeds even if a cause of action exists against B bank by reason of its wrongful transmission of the funds after compliance with section 952 by the beneficiary. On the other hand, if C's acquisition of the funds was not in "good faith, and for a valuable consideration," he would be required to return the proceeds even though B bank was protected in the premises by reason of the beneficiary's failure to comply with section 952. In sum, neither section 952, nor the potential liability of the depository bank *in its role as drawee,* has any bearing upon the rights of *the transferee.*

It appears to me that these fundamental truths have become confused in the majority opinion because the drawee bank is also the transferee. In support of the instant summary judgment, respondents need not contend that Bank is liable for its actions *as drawee-depository.* They may concede that by reason of their failure to comply with section 952, Bank had the right to "honor" the draft here in issue by effecting the necessary bookkeeping entries required thereby. The sole issue presented is this: Does the bank, *as trustee,* have the right to retain the misappropriated funds when it applied them to a

---

[1]Actual fraud on the part of the transferee, of course, is not a prerequisite to recovery in this type of action. In addition, since the evidence is unquestionably conflicting on this issue, I assume for purposes of passing upon the instant summary judgment that Bank's conduct in connection with the instant checks *in its capacity as depository-drawee* did not constitute an actual fraud knowingly perpetrated upon respondents. Parenthetically, however, it might be noted that if the evidence presented at the time of trial should warrant a finding that such fraud had been committed, then Bank would be liable therefor regardless of the conceded fact that respondents' notice to Bank did not meet the requirements of section 952. Nevertheless, as indicated, this potential alternative theory of recovery need not concern us in reviewing the present appeal.

pre-existing indebtedness of the corporate trustee's directors after admittedly having received notice of the beneficiary's claim thereto?

Section 952 requires that certain formal and burdensome actions must be taken by one who wishes to stay the hand of a depository bank that he believes may receive instructions to transfer assets from one of its accounts in breach of trust. However, this section certainly could not, and should not, be construed to require that such formalities must be met in order to preclude *the transferee,* whether the bank or a third party, from retaining misappropriated property not received "in good faith, and for a valuable consideration."

A petition for a rehearing was denied September 18, 1968, and the petition of the plaintiffs, cross-defendants and appellants for a hearing by the Supreme Court was denied October 17, 1968. Peters, J., was of the opinion that the petition should be granted.