**CARTER OIL CO. v. McCASLAND et al.**

No. 4210.

United States Court of Appeals
Tenth Circuit.

July 10, 1951.

Rehearing Denied Aug. 17, 1951.

Phillips, Chief Judge, dissented.

Alfred Stevenson, Holdenville, Okl. (Forrest M. Darrough and Walter Davison, Tulsa, Okl., on the brief), for appellant.

C. D. Cund, Duncan, Okl., and Clarence McElroy, Chickasha, Okl., for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action for a declaratory judgment, in which appellees sought a declaration of rights between them and appellants under a contract and an assignment, assigning to appellees certain rights in and to oil and gas producing horizons encountered at a depth of less than 4,000 feet. The acreage covered by the contract and assignment was classified, in the contract and is so designated in the pleadings, into four Tracts numbered 1 to 4, respectively. By stipulation of the parties, it was agreed that the law suit would be confined to the leases covering only Tracts 2 and 3. Pertinent portions of the contract and assignment are set out in footnote 1.[1] So far as material, the contract in substance provided that Carter Oil Company, herein referred to as Carter, would assign to McCasland its rights in the leases "insofar as they covered producing horizons above a depth of 4,000 feet, subject to the terms and provisions of this agreement." It provided that upon demand and after the commencement of a well by McCasland, Carter would execute assignments in writing on Carter's usual forms "assigning to McCasland the oil and gas leasehold estates on the properties heretofore described above the depth of four thousand (4,000) feet, such assignments to be made specifically subject to the terms and conditions of this agreement." The contract contained other provisions, giving Carter an overriding royalty in producing wells drilled by McCasland and protecting it in the production it already had on the acreage as well as other provisions not involved in this litigation.

The written assignment, executed and delivered pursuant to the contract, assigned all of Carter's rights, title and interest in and to the leases "insofar as said leases cover producing horizons above the depth of 4,000 feet." The assignment reserved to Carter all interest in the tracts "insofar as they cover producing horizons below the depth of 4,000 feet * * *." The leases described in the contract and assignment covered land in the Carter-Knox field. While many wells had been drilled in the field, the Woods Sand Zone Producing Formation, the one in question here, was

---

[1] "* * * Whereas, the parties hereto have arrived at an agreement whereby Carter is to assign to McCasland its rights in and to said leases insofar as they cover the properties described above, and insofar as they cover producing horizons above the depth of 4,000 feet, subject to the terms and provisions of this agreement: * * *.

"Upon demand after approval of titles and commencement of the actual drilling of the test well hereinafter provided for, Carter agrees to make, execute and deliver to McCasland assignments in writing on Carter's usual form * * * assigning to McCasland the oil and gas leasehold estates on the properties heretofore described, above the depth of four thousand (4,000) feet, such assignments to be made specifically subject to the terms and conditions of this agreement.

"No well shall be completed by McCasland on any ten acre tract upon which a producing well is now located, to the same horizon as is being produced in the well on that particular ten acre tract."

By the assignment dated May 8, 1939, Carter assigned its right, title and interest in and to the leases referred to above "insofar as said leases cover producing horizons above the depth of 4,000 feet."

"Assignor further expressly retains, saves and reserves from the operation of the within assignment and unto itself, its successors and assigns, all right, title and interest in and to Tracts 1, 2, 3 and 4, above, insofar as they cover producing horizons below the depth of 4,000 feet. * * *"

unknown at the time of the execution of these instruments. It was first discovered in February, 1947, in a well drilled by Mc-Casland. This well was a gas well and never produced oil. A number of wells were drilled into the formation by McCasland and Carter as well as others. These wells demonstrated that the formation was an unorthodox one. While the other formations in the field were comparatively level, this was a slanting formation, dipping from 58 to 60 degrees and having an average width of from 1,000 to 1,200 feet. In some places, it is encountered above 4,000 feet, while in others it is found at a considerable depth below that point. In some places on these two tracts, it was encountered above 4,000 feet, while at other points it was found below that depth. In wells which McCasland drilled on the lands covered by the assigned leases, the Woods Sand Horizon was encountered above 4,000 feet, while in two wells drilled by Carter on the same acreage, the sand was encountered below 4,000 feet. One of the wells drilled by Carter to a depth of 4,487 feet failed to find the sand. Carter obtained permission of the Oklahoma Corporation Commission to whipstock this well to the East so as to drill into the Woods Sand Formation below 4,000 feet. Permission having been obtained, the well was whipstocked 220 feet East to a depth of 4,312 feet, where the sand was encountered.

The controversy centers around Carter's claim that it had the right to drill into the Woods Sand Formation on the assigned acreage, where it is encountered at a depth of more than 4,000 feet and produce oil therefrom, when it takes that oil from a producing horizon, which had been penetrated by McCasland's wells at a depth of less than 4,000 feet and where all the oil in the formation can and will be produced without economic loss from McCasland wells.

The trial court made exhaustive findings of fact and conclusions of law. It found as a fact that the reservoir content of the Woods Sand Zone Producing Horizon was held under pressure; that it had a gas cap at the top with oil immediately below; that the oil contained some gas in solution; that

in the lower part of the structure below the oil, water was found in great quantities; that there was and would continue to be an active water drive and that all the recoverable oil and gas contained in the common reservoir, from which all wells involved in this action were producing, could under normal operating methods and conditions be recovered through the McCasland wells. The trial court also found that it was never contemplated by the parties that Carter and McCasland would produce oil or gas from the same common pool. The court concluded as a matter of law that the phrase "insofar as they cover producing horizons above the depth of four thousand (4,000) feet" as used in the contract and assignment in this action means "insofar as they cover, embrace and include producing horizons encountered above four thousand (4,000) feet." Based upon its findings and conclusions of law, the court entered judgment that McCasland was entitled to produce all the oil and gas contained in the Woods Sand Zone Producing Horizon underlying the lands in question from wells drilled or to be drilled by McCasland to a depth of not more than 4,000 feet, subject only to Carter's overriding royalty; that Carter was guilty of conversion in producing oil and gas from that sand on the tracts in question and that McCasland was entitled to an accounting from Carter.

While numerous assignments of error are urged, the crux of the controversy is whether Carter, having assigned the right to drill for and produce oil and gas from a producing horizon, encountered above 4,000 feet, may nonetheless drill into and produce from this common source of supply, where the pool dips below the 4,000 foot mark, and when it is established that all the oil in the pool, whether lying above or below the 4,000 foot mark, can be produced from wells entering the pool above the 4,000 foot level. The answer turns upon the construction of the contract and assignment.

The rules of construction relating to written contracts are well established and need no extended discussion. Extrinsic evidence may be received only when there is ambiguity in the language used which

makes uncertain the meaning or intent of the parties. That is the mandate of the Oklahoma Statutes relating to the construction of contracts as well as the general law. So also contracts are not necessarily rendered ambiguous by the mere fact that parties thereto disagree as to their meaning.

In what sense did the parties employ the phrase "producing horizon"? The trial court concluded as a matter of law that the term "producing horizon" as used in the oil industry and as used in the contract and assignment in this case was a technical term and meant "A bed of some material, lime, sand or conglomorate, containing or holding petroleum, oil or gas, and has some thickness in order to hold fluid or gas." "Producing horizon" as used by the oil fraternity has a technical meaning. A number of witnesses engaged in the oil industry testified as to the meaning ascribed to the term by the oil fraternity. Their testimony was properly received and supports the construction placed upon this phrase by the trial court.

It is a matter of common knowledge that oil is found in pools or reservoirs below the earth's surface and that these pools lie one upon the other and are found at various depths below the earth's surface and are separated by intervening masses of earth and rock formation. It is also, we think, a matter of common knowledge that, while a pool or lake of oil will have high or low spots, generally in its contour, it is comparatively level and is encountered throughout the field at approximately the same depth below the earth's surface and without any pronounced or marked degree of variation.

These facts, as well as the expert testimony, supports the court's construction placed upon the term "producing horizon." In fine, the term "producing horizon" means the point at which a pool, reservoir or common source of supply of oil or gas is encountered and from which the oil therein may be extracted.

The Woods Sand Formation, which dipped at an average of from 58 to 60 degrees, was an unorthodox one. Its existence was unknown and uncontemplated by the parties at the time of the execution of the contract and assignment. Its later discovery did not change the meaning of the phrase "producing horizon" or the sense in which the term was used by the parties at the time they entered into these contracts. The subsequent discovery of its characteristics could not increase or diminish the rights of either party under the agreements. The exclusive right granted by the contract and assignment to drill wells into all producing horizons found above 4,000 feet carried with it the exclusive right to produce therefrom all the recoverable oil and gas.

We concur in the court's finding that it was never contemplated that Carter and McCasland would produce oil from the same pool or common source of supply. The late case of Palmer Oil Corp. v. Phillips Petroleum Co., Okl.Sup., 231 P.2d 997, is distinguishable upon the facts. It was a proration case and did not involve the right of more than one person or company to drill into a common source of supply and produce oil therefrom. The language of the contract under which the contestants claimed a right under a proration order, giving each of them an interest in the oil produced from a single pool, is materially different from the language in the instruments in this case. There the Gulf Oil Corporation, the owner of an oil and gas lease, assigned to Palmer "all it rights, title and interest therein to a depth of 6,000 feet 'retaining the lease as to the oil, gas and casing head gas, together with all the rights, privileges and appurtenances thereunto belonging below the depth of 6,000 feet'." A well was drilled into a sand which lay partly above and partly below the 6,000 foot line. The Corporation Commission and the Supreme Court merely held that the assignor had not parted with the oil that lay below the 6,000 foot line and was, therefore, entitled under the proration order to an equitable division of the oil produced from the wells of its assignee. The assignment did not, as here, contain the words "producing horizon." The case, therefore, throws no light on the problem confronting us in this case.

It is further contended that in any event McCasland was estopped to deny the right of Carter to take oil from the Woods Sand Formation at points below 4,000 feet. McCasland did not object to the drilling by Carter of its B. A. Horton No. 8 well. Under any construction of the agreements, Carter had a right to drill this well and explore the acreage for producing horizons, as that term was understood by the parties, lying below 4,000 feet. That was the well that was drilled to a depth of 4,487 feet and in which no oil was found at that depth. Later when Carter asked the Corporation Commission for permission to whipstock the well to the East, McCasland did object. Other statements made before the Corporation Commission at that time indicate that a dispute might arise between the parties as to their correlative rights in this pool, which the Corporation Commission could not settle. There is no evidence of any direct statement or conduct on McCasland's part, from which it conclusively appears that Carter was lulled into security to its detriment in drilling the wells in controversy. The most that can be said is that there was some conflict in the evidence and the inferences deducible therefrom. This was a matter for the trial court. The trial court resolved this conflict against Carter. The finding is not clearly erroneous and, therefore, will not be disturbed on appeal.

Finally, the decree is challenged on the ground that the court erred in finding and concluding as a matter of law that Carter was guilty of conversion, in taking oil from the Woods Sand Zone Formation at points more than 4,000 feet below the surface and in including an adjudication to that effect in the judgment. At an early stage in the proceedings, an attorney for McCasland stated that "no accounting was involved," and except as an incident to the direct issues involved no evidence was introduced relating to the method of production on the part of Carter. The question of conversion, however, was inherent in the issues presented by the petition for a declaratory judgment and for a declaration of rights. Carter conceded that it was taking oil from the formation in question from depths below 4,000 feet. Having determined that Carter was not entitled to take such oil and that such taking constituted an invasion of the rights granted by the contract and assignment to McCasland, it follows as a matter of law that such taking constituted conversion. McCasland's prayer for the entry of a "judgment declaring that defendant is without right to assert any right, title or interest in or to the oil contained in the common source of supply * * *," if sustained, as it was, had the legal effect under the admitted facts of requiring a judgment finding Carter guilty of conversion.

Under Rule 54(c) of the Rules of Civil Procedure, 28 U.S.C.A., it is the duty of the court to grant the relief to which a party is entitled irrespective of the prayer for relief in the pleadings.[2] Furthermore, Paragraph 4 of the prayer in which McCasland asked for the entry of "a judgment granting to the plaintiff such other and further relief as is just and equitable" warranted the court in entering a judgment, finding Carter guilty of conversion.

Having determined that Carter was not entitled to produce oil from that producing horizon at points below 4,000 feet underneath the surface, it followed as a matter of law that such taking constituted conversion. No objection or exception was directed to the court's conclusion of law to that effect. The judgment was prepared by the attorneys of McCasland and was presented to the court for entry ten days after the filing of the findings of fact and conclusions of law. At that time, Carter's attorneys objected to the provision adjudicating Carter guilty of conversion. The ground of objection was that the issue of conversion was not in the case and had not been presented under the evidence. The court stated in substance that such provision should be in the judgment on the theory that the facts and conclusions that the court had reached necessarily involved in the adjudication whether or not the oil produced by Carter from the Woods

2. Garland v. Garland, 10 Cir., 165 F.2d 131.

Sand Formation was converted. The court further stated that such questions should be determined in order that all features possible might be presented on appeal. When the court announced its intention of including the provision in the judgment, Carter did not ask that the trial be reopened in order that it might introduce evidence relating to the issue or otherwise litigate it. It merely objected to the provision in the judgment. We think the question of conversion was inherent under the pleadings and issues as framed thereby and that Carter was afforded full opportunity to adjudicate that issue. It was afforded that opportunity in presenting its theory as to the construction to be placed upon the contract and being permitted full opportunity to present evidence to sustain that construction. It was afforded the full opportunity to establish that under the contract and assignment it had the right to enter this formation below 4,000 feet and take oil therefrom. When the court rejected this theory, a finding of conversion of the oil which it took followed as a legal conclusion.

■ The issue that was not adjudicated was that of damages flowing from the conversion. As to that issue jurisdiction was retained by the court "for the purpose of awarding to the plaintiffs such other and further relief in the nature of an accounting from the defendants, as said plaintiffs may be entitled to have awarded or granted to them." The legal principles controlling the accounting are those established by the Oklahoma decisions. When that issue is presented for determination, both parties no doubt will be afforded full opportunity to present their theory of the accounting under Oklahoma law, including any credits to which Carter may claim to be entitled to under such decisions, by virtue of the conditions under which the wells involved in the accounting were drilled.

The judgment of the trial court is thus affirmed.

PHILLIPS, Chief Judge (dissenting).

On January 31, 1939, The Carter Oil Company,[1] was the owner of oil and gas mining leases covering the following described lands in Grady County, Oklahoma:

Tract 1: Northwest Quarter of Northeast Quarter of Southwest Quarter (NW/4 of NE/4 of SW/4) of Section 8, Township 3 North, Range 5 West.

Tract 2: Southeast Quarter of Southeast Quarter (SE/4 of SE/4) of Section 8, and North half of North half of Northeast Quarter (N/2 of N/2 of NE/4) and Northeast Quarter of Northeast Quarter of Northwest Quarter (NE/4 of NE/4 of NW/4) of Section 17, Township 3 North, Range 5 West.

Tract 3: South half of North half of Northeast Quarter (S/2 of N/2 of NE/4) of Section 17, Township 3 North, Range 5 West,

and was the owner of an undivided ½ interest in an oil and gas mining lease covering the following described lands in Grady County, Oklahoma:

Tract 4: West half of Southeast Quarter (W/2 of SE/4) and East half of East half of Southwest Quarter (E/2 of E/2 of SW/4) of Section 8, Township 3 North, Range 5 West.

This action involves an agreement by Carter to assign an interest in such leases to T. H. McCasland, and the assignment made pursuant to such agreement, which was expressly made subject to the terms and conditions of the agreement. The material portions of the agreement read as follows:

"* * * whereas, the parties hereto have arrived at an agreement whereby Carter is to assign to McCasland its rights in and to said leases insofar as they cover the properties described above, and insofar as they cover producing horizons above the depth of 4,000 feet, subject to the terms and provisions of this agreement: * * *.

*    *    *    *    *    *

"Upon demand after approval of titles and commencement of the actual drilling of the test well hereinafter provided for, Carter agrees to make, execute and deliver to McCasland assignments in writing on Carter's usual form, and without warranty of title, *assigning to McCasland the oil and*

1. Hereinafter called Carter.

*gas leasehold estates on the properties heretofore described, above the depth of four thousand (4000) feet, \* \* \*.* (Italics mine.)

\*   \*   \*   \*   \*   \*

"It is understood that Carter, either alone, or in conjunction with Continental Oil Company, is at this time producing oil and gas from wells heretofore drilled on the lands above described. Carter, or Carter and Continental Oil Company, as the case may be, shall retain full title to said wells, with the right to continue to operate and produce the same from their present producing horizon, \* \* \*. *McCasland, in drilling any wells on the premises to be assigned hereunder, shall do so in such a manner as not to interfere with Carter's and Continental Oil Company's continued operation of said producing wells, or with respect to wells which may hereafter be drilled and operated on said premises, below the depth of four (4000) thousand feet.*" (Italics mine.)

By the assignment dated May 8, 1939, Carter assigned its right, title and interest in and to the leases referred to above "Insofar as said leases cover producing horizons above the depth of 4,000 feet." It expressly provided: "Assignor further expressly retains, saves and reserves from the operation of the within Assignment and unto itself, its successors and assigns, all right, title and interest in and to Tracts 1, 2, 3 and 4, above, insofar as they cover producing horizons below the depth of 4,000 feet, together with the right of ingress and egress for the purpose of exploring for and producing oil, gas and casinghead gas therefrom."

The assignment provided that it was subject: "\* \* \* to all rights and interests reserved by and to all of the terms, covenants and provisions contained in a certain Agreement entered into under date of January 31st, 1939, by and between the parties hereto pertaining to the aforesaid leases and the development thereof."

At the time the contract was entered into, and until the early part of 1947, neither of the parties knew of the existence of the Woods Sand formation. In February, 1947, McCasland drilled a well to the south of the acreage covered by such leases, in the NW/4 of the SE/4 of the NE/4 of S 17, T 3 N, R 5 W, into the Woods Sand formation. That was the first well to reach that formation. It produced gas, but no oil, and since there was no market for the gas it has been shut down since its completion. In April, 1947, the Ohio Oil Company completed a well at the depth of 3,941 feet in the Woods Sand formation on the NE/4 of the SW/4 of the NE/4 of S 17, T 3 N, R 5 W. It had an initial oil production of 798 barrels per day. The drilling of further wells to the Woods Sand formation by operators in the area, including Carter and McCasland, revealed that it is an unorthodox formation, in that it is a slanting one, the dip averaging 58 degrees. The other formations in the field are comparatively level. Such drilling also demonstrated that the Woods Sand formation is a long, narrow one, extending several miles from northwest to southeast and being 1,000 to 1,200 feet in width; that the thickness of the sand is approximately 109 feet; and that a substantial portion thereof lies above, and a substantial portion below the 4,000 foot level.

McCasland and his associates completed the well, McCasland No. 4, on the SE/4 of the NW/4 of the NE/4 of S 17 in July, 1947, at a depth of 3,702 feet. It produced gas, but no oil. In September, 1947, they completed a well, McCasland No. 5, on the SW/4 of the NW/4 of the NE/4 of S 17 in the Woods Sand formation at a depth of 3,954 feet. It produced oil in paying quantities. In September, 1948, they completed a well, McCasland No. 7, on the SE/4 of the NW/4 of the NE/4 of S 17 in the Woods Sand formation at a depth of 3,560 feet. It produced some oil, but later was shut in to gas. In December, 1947, they completed a well, McCasland-B. A. Horton No. 3, in the NW/4 of the NW/4 of the NE/4 of S 17 in the Woods Sand formation at a depth of 3,684 feet. It produced oil in paying quantities.

Before Carter drilled any wells to the Woods Sand formation it opened negotiations with McCasland to the end that they might drill wells in the Woods Sand formation as partnership wells to avoid unnecessary drilling expenses. These negotiations

failed. In December, 1947, Carter commenced a well which it completed in June, 1948, in the Woods Sand formation. That well, Carter-B. A. Horton No. 8, was located on the NE/4 of the NE/4 of the NW/4 of S 17, being the 10 acres immediately west of the McCasland-B. A. Horton No. 3. McCasland had full knowledge of the commencement and of the drilling thereof. It was drilled to a depth of 4,487 feet, where it missed the Woods Sand formation. Carter, believing that the formation could be found a short distance east, applied to the Oklahoma Corporation Commission for permission to whipstock it to the east so as to drill into the Woods Sand formation at a depth below 4,000 feet. The Commission's permission was given and Carter whipstocked the well 220 feet east to a depth of 4,314 feet. In September, 1948, Carter completed a well, Carter-W. E. Woods No. 4, on the SW/4 of the NW/4 of the NE/4 of S 17 in the Woods Sand formation at a depth of 4,200 feet.

All of the wells drilled by McCasland and his associates drilled through that part of the Woods Sand formation lying above the depth of 4,000 feet. All the wells drilled by Carter first entered the Woods Sand formation below the depth of 4,000 feet and produced oil in paying quantities.

On July 19, 1949, McCasland and his associates, the appellees, commenced this action against Carter for a declaratory judgment adjudging that Carter had no interest in the Woods Sand formation and decreeing, fixing and determining the rights of the appellees and Carter under the contract and assignment.

The trial court found that all of the recoverable oil and gas in the Woods Sand formation under the leases in question, under normal operation methods and conditions, can be recovered by the McCasland wells.

By its decree the trial court adjudged that the appellees were entitled to produce all the oil and gas contained in the Woods Sand formation in the SE/4 of the SE/4 of S 8; the N./2 of the N/2 of the NE/4, and the NE/4 of the NE/4 of the NW/4 of S 17, and the S/2 of the N/2 of the NE/4 of S 17 from wells drilled or to be drilled to a depth of not greater than 4,000 feet, subject to the right of Carter to receive its royalty interest reserved by its assignment to McCasland; that Carter, to the extent that it has or may produce oil or gas from the Woods Sand formation on such land, has been and will be guilty of conversion and is liable to account to appellees therefor. It retained jurisdiction for the purpose of the accounting. Carter has appealed.

Chambers' Technical Dictionary, Rev. Ed., defines "horizon, geological," as "synonymous with stratigraphical level, and has reference to the systemic position of a stratum on the geological time-scale." Webster's New International Dictionary, 2d Edition, defines it as "The deposit of a particular time, usually identified by distinctive fossils, * * *." As used in the contract and assignment I think it means a producing oil or gas sand. The trial court construed the phrase "producing horizons above the depth of 4,000 feet" as including any producing sand, a portion, or a substantial portion of which is above the depth of 4,000 feet and that it precludes Carter from producing oil from such a sand through wells drilled into that part of the formation which lies below the 4,000 foot level, although the wells enter the upper surface level of the sand below 4,000 feet. I cannot agree with that construction of the phrase. The language of the granting clause and of the reservation in the assignment makes it perfectly clear that Carter reserved all of its right, title and interest in producing horizons below the depth of 4,000 feet to the same extent that it granted all its right, title and interest in producing horizons above the depth of 4,000 feet. The wording of the grant is identical with the wording of the reservation, except one refers to producing horizons above and one refers to producing horizons below the 4,000 foot level. A substantial portion of the Woods Sand formation lies above and a substantial portion thereof below the 4,000 foot level. It would be as logical to say that such producing horizon lies below the 4,000 foot level and that Carter, under the reservation in its assignment, is entitled to produce all the oil from such formation

if it can do so by wells drilled into the formation below the 4,000 foot level as it is to say that such formation lies above the 4,000 foot level and that McCasland, under the assignment, is entitled to produce all the oil from such formation if it can do so through wells drilled into the formation to a depth of not greater than 4,000 feet. The fact is that the formation lies partly above and partly below. The contract expressly provided that Carter should have the right in the future to drill and operate wells on the leases below the depth of 4,000 feet. At the time the contract was entered into and the assignment made, the Woods Sand formation was unknown, and it may be doubted that the parties contemplated that such an unorthodox sand would be encountered. However, since no wells had been drilled in the area to a depth of 4,000 feet, the parties must have contemplated the possibility that a sand might be discovered lying partly above and partly below 4,000 feet. It seems to me that it was the intent of the parties to assign to McCasland all producing horizons lying above 4,000 feet and to reserve to Carter all producing horizons lying below 4,000 feet, and if a producing horizon was discovered lying partly above and partly below 4,000 feet, McCasland should take the portion above and Carter retain the portion below 4,000 feet. It seems to me that any doubt that such was the intention of the parties is removed by the provision expressly reserving to Carter the right to drill and operate wells below the depth of 4,000 feet.

Carter only asserted the right to drill and operate wells which entered that sand below the 4,000 foot level. Clearly, such wells produced oil from a producing sand below the 4,000 foot level.

Even if the sand was approximately level and the entire upper surface thereof was above the 4,000 foot level, if a substantial portion of the same were below the 4,000 foot level, I think Carter could drill and operate wells from below the 4,000 foot level, so long as it did not permit oil to enter its well above the 4,000 foot level. See Palmer Oil Corp. v. Phillips Petroleum Co., Okl. Sup., 231 P.2d 997, 1012–1013.

The notion that the parties did not intend that both Carter and McCasland should produce oil from the same producing horizon is refuted by the very terms of the agreement. At the time the agreement was entered into Carter had drilled and was producing oil from formations above the 4,000 foot level. McCasland was authorized to drill wells into and produce oil from such formations, subject only to the limitation that he would not drill upon any 10-acre tract upon which Carter had a producing well.

The fact that the wells of McCasland and his associates, drilled to a depth of less than 4,000 feet, will extract oil from the sand below 4,000 feet, and that Carter's wells, drilled into the sand, the upper surface of which lies below the 4,000 foot level, may extract oil from that part of the sand which lies above the 4,000 foot level, is immaterial. To give force to that fact would be to apply the law of discovery rather than the law of capture. The law of discovery does not apply to oil and gas wells. On the contrary, the rule of capture applies in Oklahoma. Gruger v. Phillips Petroleum Co., 192 Okl. 259, 135 P.2d 485.

I would remand, with instructions to vacate the judgment, and to construe the contract in accordance with the above views, and enter judgment accordingly.