**BANK OF CHINA**

v.

**WELLS FARGO BANK & UNION TRUST CO. (two cases).**

Nos. 13412, 13413.

United States Court of Appeals, Ninth Circuit.

Dec. 21, 1953.

McCutchen, Thomas, Matthews, Griffiths & Greene, Morris M. Doyle, Owen Jameson, San Francisco, Cal., James B. Burke, Burke & Burke, New York, N. Y., for appellant.

Lloyd W. Dinkelspiel, Martin Minney, Jr., Edward W. Rosston, Heller, Ehrman,

White & McAuliffe, San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and McCORMICK and HARRIS, District Judges.

DENMAN, Chief Judge.

These appeals are from parts of two judgments, stated in a single document, in two actions in the district court. In each of these actions appellant sought and recovered from the appellee moneys deposited with it which it had refused to pay upon appellant's demand. The judgment awarded costs and attorney's fees to the appellee and denied any interest to the appellant on the moneys sued for. The facts in each case present the same questions of law and the two cases were consolidated for hearing both below and here. The two judgments in the single document were duly entered and appealed from.

The questions presented by these appeals are (1) whether the district court erred in denying the Bank any interest on moneys withheld by Wells Fargo after demands by the Bank, for the period prior to the Bank's deposit of the money in court, during which time Wells Fargo retained the deposit with it for its own use; and (2) whether the district court erred in directing that out-of-pocket costs and attorney's fees be paid out of a fund in the registry of the court as an item of costs.

For several years prior to the institution of the first action (No. 13,412) on November 9, 1949, the appellant, Bank of China, was a depositor in appellee, Wells Fargo Bank & Union Trust Co. (For convenience, the parties will hereafter be referred to as the "Bank" and as "Wells Fargo"). The Bank is a corporation chartered as an international exchange bank by the Republic of China. Two-thirds of its stock is owned by the Chinese Government and the remaining stock was and presumably still is held by private shareholders who are Chinese nationals. The Bank is governed by a board of twenty-five directors, thirteen appointed by the Government and twelve elected by private shareholders.

The charter of the Bank provides that its head office should be located in Shanghai. With the successful advances of the Communist armies, the Bank's headquarters was ordered moved with the Nationalist Government from city to city, eventually ending up in Taipeh, Formosa. At the end of April, 1949, the foreign department of the Bank was moved to Hongkong, and new ciphers and test keys were authorized for the operation of its accounts abroad. These were circulated to the Bank's correspondents, including Wells Fargo. On June 27, 1949, Wells Fargo received a cable from Shanghai, which had by then fallen to the Communists. This cable used the discarded test key, was sent in the name of the Bank, and read as follows:

"Using Your Testkey With Us 516 Following the Liberation of Shanghai This Bank was Taken Over by the Shanghai Military Control Commission by Order of the Chinese Peoples Liberation Army East China Command on May Twenty-eighth and the Powers Vested in Its Original Board of Directors are Now Temporarily Vested in the East China Financial and Economic Affairs Administration Stop Those Officers who Escaped to Hongkong and Elsewhere Have Been Dismissed and Can No Longer Represent This Bank Stop Their Specimen Signatures and Testkey Established Between You and Them Should Be Considered Null and Void Stop All Communications From Them Are Unauthorized Stop You Are Requested Not to Make Payment Except by Our Specific Order Stop Please Cable Reply."

On the same day, Mr. Frederick J. Hellman, vice president of Wells Fargo, sent a telegram to Mr. R. C. Chen, head of the Bank's foreign department, which read as follows:

"In Order to Avoid any Possible Future Complications Suggest Your

Shanghai Account Be Transferred to Account Reading Bank of China Foreign Department Hongkong. Best Regards."

To this wire, Mr. Chen replied the following day as follows:

"Seven One One Eight Two. Yours June Twenty-Seventh. We Agree to Transfer Our Shanghai Account to New Account Under Title of Quote Bank of China Foreign Department Hongkong Unquote."

Mr. Hellman then sent the following letter to Mr. Chen on June 29:

"This will acknowledge receipt of your wire of June 28, and in accordance with your instructions, under separate advice, we have transferred your Shanghai account to a new account reading—"Bank of China, Foreign Department, Hongkong." We thought it best to advise this move in case the Communists took some legal means to tie up these funds although I admit it is rather far-fetched as I do not believe they would have any standing in court in this country.

"Hoping that you and Mrs. Chen are well, and with kindest personal regards."

These communications were followed by a number of cables in the old testkey from Shanghai to the effect that the Communist Government of China was the only legal government and that they had taken over all government properties formerly held by the Nationalist Government.

The deposits made by the Bank and its various branches which were in the hands of Wells Fargo at the commencement of the controversy were as follows:

| | |
|---|---|
| Head Office | $626,860.07 |
| Hongkong Branch | 9,923.08 |
| New York Branch | 2,525.63* |
| Tientsin Branch | 156,739.28 |
| Tsingtao Branch | 5,036.58 |
| Total | $801,084.64 |

*On April 29, 1950, a $2,500.00 draft was paid on this account inadvertently.

On October 7, 1949, the Foreign Department of the Bank made a demand upon Wells Fargo for $600,000 of the funds in the Head Office Account which had at that time been transferred to the "Bank of China, Foreign Department, Hongkong" account. This demand was refused by the following cable, sent from Mr. Hellman to Mr. Chen:

"Replying Your Cable to Me Re Request for Transfer of $600,000 My Letter To You of June 29th was Sent Without Reference to Our Legal Counsel Who Now Advise It is Impossible to Make Transfer Voluntarily and Only After Suit Commenced by You and Judgment in Your Favor. We Are Aware of Bank of America's Decision but Again Our Attorneys Do Not Agree That We Can Take Similar Action. Personally Deeply Regret Inability to Comply With Your Request. Best Regards."

On November 9, 1949, the first suit (Appeal No. 13,412) was filed. The filing of this suit constituted a demand for the balance of $26,860.07 in the Head Office Account. Motions for summary judgment were filed and were taken under submission. Trial was set for December 29, 1949. On December 27, the Bank requested and received a continuance to February 1, 1950. On January 26, 1950, attorneys representing the Bank as purportedly constituted under the Communists appeared. The second suit (Appeal No. 13,413) was commenced on April 26, 1950. This second suit constituted a demand for the $174,224.57 which the Bank had on deposit with Wells Fargo through its various branches. The two cases were consolidated for hearing in the district court.

The court felt that the conditions in China and the state of the evidence were such that it could not at that time determine which group claiming to represent the Bank had lawful authority. Ac-

cordingly, on August 7, 1950, it entered essentially the same order in each of the actions. These ordered the cases continued sine die, denied the motion for summary judgment without prejudice, and provided that Wells Fargo was relieved of all claims for interest on the moneys provided that they be deposited with the registry of the court. See D. C., 92 F.Supp. 920. The sums of $626,-860.07 and $171,724.57 were deposited in the registry of the court pursuant to these orders on August 14, 1950. Appeals taken to this court were dismissed without prejudice, and the cases were remanded to the district court that it might re-examine them in the light of changing world conditions and such additional evidence as might be made available to it by the respective parties. 9 Cir., 190 F.2d 1010. On remand, the court entered judgments, D.C., 104 F. Supp. 59, which (1) directed that the sums in the registry of the court, less the amounts allowed as costs and attorney's fees, be paid to the group representing the Nationalist Government; (2) directed that Wells Fargo be paid its out-of-pocket costs of $240.63 and attorney's fees of $10,000 as costs out of the moneys deposited in the registry of the court; and (3) denied the Bank interest on any part of the moneys. No appeal was taken from the first part of the judgments, but the Bank has appealed from the latter two parts.

■ These actions are diversity suits between a subject or an agency of a foreign state (Nationalist China) and a citizen of the United States. 28 U.S.C. § 1332(a) (2). The Bank is claiming that it was deprived of its money wrongfully and is seeking damages therefor. Under the Rules of Decision Act, 28 U.S.C. § 1652, the measure of damages must be determined by the laws of California. Carter Oil Co. v. McCasland, 10 Cir., 190 F.2d 887, certiorari denied, 342 U.S. 870, 899, 72 S.Ct. 113, 96 L.Ed. 654.

■ It is not disputed by Wells Fargo that the Bank is the owner of the moneys that it held and ultimately deposited with the court. Likewise it is not disputed that the moneys were due upon demand by the Bank; and that the general rule in California is that where money is due upon demand and a demand is made and refused, interest is allowable from the date of the demand. Anderson v. Pacific Bank, 112 Cal. 598, 603, 44 P. 1063, 32 L.R.A. 479; Black v. Vermont Marble Co., 137 Cal. 683, 685, 70 P. 776; Commercial Discount Co. v. Bank of America, 61 Cal.App.2d 721, 726, 143 P. 2d 484. What Wells Fargo does contend is that there are extenuating circumstances in this case which relieve it of this liability for interest.

■ We do not see how any circumstances could relieve Wells Fargo of its liability for interest during the period between the various demands and the deposits into court. During this period, Wells Fargo was enjoying the beneficial use of this money. It could be used to satisfy the reserve requirements,[1] to make investments upon which interest would be drawn, or for any other banking purpose. There is no showing that Wells Fargo set aside or in any other way restricted the use of the funds deposited by the Bank after demand was made. Furthermore, there are several steps which Wells Fargo could have taken to protect itself from the feared double liability.

■ Upon receiving the conflicting demands, Wells Fargo at once had available to it the remedy of interpleader under § 386, Calif.Code Civ.Proc. While it is true that only one corporation— the Bank—had a valid claim to the moneys deposited with Wells Fargo, the two groups claiming to represent the Bank made conflicting claims upon Wells Fargo " * * * for or relating to * * * the performance of [Wells Fargo's] obligation * * * " to deliver the moneys to the Bank upon demand. § 386, Calif.Code Civ.Proc. Hence, Wells Fargo could have brought an action of interpleader in the state court immediately following the demand by the Na-

1. See 12 C.F.R. §§ 204.1–204.5; Calif. Financial Code §§ 1250–1257.

tionalist group unless the impossibility of obtaining personal service would prevent such an action.

Such is not the case here, for it appears that the action relates to, or the subject of which is, personal property within the state, and application may be made to the court for an order to make service by publication upon persons having or claiming an interest in such property and who cannot be served within the State. Calif. Code Civ.Proc. § 412. After such an action is filed, the court would have had the power to order the payment of the moneys into court and to discharge Wells Fargo from all liability. Kimball v. Richardson-Kimball Co., 111 Cal. 386, 394, 43 P. 1111; Williams v. Gilmore, 51 Cal.App.2d 684, 688, 125 P.2d 539. Such an action would not be "against" but by an "insured bank" and hence would not be within the exclusive jurisdiction of the federal courts under 12 U.S.C.A. § 632 (4th par.) considered infra.

Once the suits against it had been commenced, Wells Fargo could have served notice upon the other parties, disclaimed all interests in the moneys, and requested the court's permission to deposit the money into the registry of the court pursuant to Rule 67, Federal Rules of Civil Procedure, 28 U.S.C. This was not done. If such a request had been made and granted, liability for interest would have ceased at that time. Calif.Civ.Code § 3287; Perkins v. Benguet Consolidated Mining Co., 55 Cal. App.2d 720, 769, 132 P.2d 70.

Wells Fargo also had available to it the remedy of interpleader. It does not appear that Wells Fargo could have brought an action of interpleader under 28 U.S.C. § 1335 to settle its claims, since the adverse claimants must be of diverse citizenship as defined in 28 U.S.C. § 1332. The latter section does not affirmatively grant federal courts diversity jurisdiction of a suit between aliens or foreign governments, and a federal court does not have jurisdiction of such suits absent a federal question. Kavourgias v. Nicholaou Co., Ltd., 9 Cir., 148 F.2d 96, 97.

However, here there is a federal question and interpleader as it existed under the equitable doctrine prior to the adoption of 28 U.S.C. § 1335 was available. The federal question arises under 12 U.S.C.A. § 632 (4th paragraph). Under that section, where an insured bank has on deposit sums from a central bank of any recognized foreign state, any suit against the insured bank arising out of such deposit is deemed to arise under the laws of the United States and the district courts of the United States have exclusive jurisdiction thereof.[2] An "insured bank" is a bank which has its deposits insured by the Federal Deposit Insurance Corporation.[3] Wells Fargo, as a member of the Federal Reserve System, is required to be insured by the Federal Deposit Insurance Corporation,[4] and hence is an "insured bank" as that term is used in 12 U.S.C.A. § 632.

The term "central bank" is not defined in either § 632 or elsewhere in the statutes, nor has any case been found which defined the term. As used in § 632[5] the term clearly means a bank

2. "Any suit or other legal proceeding against any insured bank or any officer, director, or employee thereof, arising out of the receipt, possession, or disposition of [any property received from or for the account of a foreign state which is recognized by the Government of the United States, or from or for the account of a central bank of any such foreign state, which is held in the name of such foreign state or such central bank] shall be deemed to arise under the laws of the United States and the district courts of the United States shall have exclusive jurisdiction thereof, regardless of the amount involved * * *."

3. 12 U.S.C.A. § 632, 6th ¶ (5); 12 U.S.C.A. § 264(c) (8).

4. 12 U.S.C.A. § 264(e).

5. "Whenever (1) any insured bank has received any property from or for the account of a foreign state which is recognized by the Government of the United States, or from or for the account of a *central bank of any such foreign state* * * *." (Emphasis supplied.)

which is the fiscal agency of a recognized foreign government (e. g., a "nationalized" bank). "Any foreign bank or banker authorized to perform any one or more of the functions of a central bank" is a central bank for the purposes of the section.[6] The Bank of China is authorized by its charter to perform the following governmental fiscal functions: (1) to issue, redeem, and pay interest on government bonds in foreign markets; (2) to handle, collect, and pay government funds deposited abroad; (3) to promote and foster trade abroad; and (4) to handle a portion of the domestic deposits of government funds. A controlling interest in the Bank is held by the Government of China and the Bank is thus the Chinese Government's representative for fiscal dealings outside of China. The Nationalist Government of China was at the time these suits were commenced, and still is, the recognized government of China. The Bank of China is a central bank of a recognized foreign state.

█ Thus a federal question exists in this suit by the Bank against Wells Fargo. In order to protect itself, Wells Fargo could have interpleaded the adverse claimants by way of a cross complaint or a counterclaim, Rule 22, Federal Rules of Civil Procedure, under the equitable doctrine of interpleader. John Hancock Mut. Life Ins. Co. v. Kraft, 2 Cir., 200 F.2d 952. This was done in a similar case involving deposits of a Chinese government agency in this country. Republic of China v. American Express Co., 2 Cir., 195 F.2d 230. Such action, accompanied by a deposit into the court would have discharged Wells Fargo from all liability and would have stopped the running of interest. See Republic of China v. American Express Co., supra.

█ Wells Fargo relies upon certain irregularities in corporate procedure in asserting that it should not be required to decide at its peril a bona fide factual dispute over corporate authority. In questioning the authority of the officers of the Bank as constituted under the Nationalist Government of China, later found to have been acting with authority, Wells Fargo chose not to rely upon the protection offered by § 953 of the California Financial Code. That section provides as follows:

"When the depositor of a commercial or savings account has authorized any person to make withdrawals from the account, the bank, in the absence of written notice otherwise, may assume that any check, receipt, or order of withdrawal drawn by such person in the authorized form or manner * * * was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person."

Wells Fargo had received no written notice from the depositor withdrawing the authority of these officers to act. The only notice received was from the Communist Government of China which, as shown above, had no connection with the Bank. Having voluntarily abandoned the protection of this section, Wells Fargo refused, at its risk, to pay the amount demanded by the depositor's duly accredited agents. For this refusal it is liable in interest for the amount withheld. Anderson v. Pacific Bank, 112 Cal. 598, 603, 44 P. 1063, 32 L.R.A. 479. In answer to the contention that § 953, Calif. Financial Code, is not applicable because it is intended to cover only agents or authorized persons as distinguished from the primary authority of the principal, it is only necessary to point out that the authority of the Bank—the principal—to withdraw the moneys was never questioned by Wells Fargo. The only thing questioned was the authority of the Nationalist group to act for the Bank—clearly a question of the authority of an agent.

From the above it can be seen that Wells Fargo's position was not one of a person faced with conflicting claims and

6.  12 U.S.C.A. § 632, 6th ¶ (3).

with no adequate method of protecting itself from double liability and the imposition of interest other than the one chosen. As seen, Wells Fargo had several remedies available which would have protected it both from double liability and from the imposition of interest. That it chose a method which protected it only from double liability does not create an extenuating circumstance that will relieve it of the liability for interest.

Wells Fargo's contention that the issue of interest was finally determined by the district court's orders entered on August 7, 1950, is without merit. These orders provided in part as follows:

"That the defendant Wells Fargo Bank & Union Trust Co. shall be and it is hereby relieved of any and all claims for interest for use of the fund or because of its failure or refusal to pay said fund to plaintiff Bank of China or any other claimant to said fund or any part thereof, upon condition that it deposit [these moneys] in the Registry of this Court within ten (10) days from the date hereof."

These orders were appealed and the question of interest was briefed and argued before this court. Our dismissal of those appeals *without prejudice* and remand of the causes to the district court did not dispose of the question on the merits. The question of interest is now properly before us for decision on the merits.

Wells Fargo has also made the contention that even assuming the Bank's right to interest, such right ceased on December 29, 1949, the date originally set for trial in No. 13,412, because the Bank had sought and received a continuance. It is argued that inasmuch as the resulting delay was not the fault of Wells Fargo, it should not be required to pay interest for any time after December 29, 1949. This court has ruled, in granting a continuance, that no interest should accrue to the party seeking the continuance for the duration thereof. Rasmussen v. National Popsicle Corporation, 9 Cir., 105 F.2d 759; see also, Wolf v. Bilsky, 7 Cir., 181 F.2d 869. Wells Fargo asserts that they should be relieved of liability even for the period beyond the continuance because subsequent delays resulted from the intervention of attorneys representing Communist interests. It is argued that these attorneys would not have had an opportunity to appear in the case had not the Bank obtained the continuance.

The subsequent delays were no fault of the Bank. The authority of one Frederick V. Field to act for the Communist interests was received on December 24, 1949, prior to the date originally set for trial, and counsel were retained the same day. Counsel representing the Communist interests could have intervened prior to the date originally set for trial, the continuance merely resulted in giving them more time in which to prepare their motions. Under the doctrine of Rasmussen v. National Popsicle Co., supra, Wells Fargo is entitled to a suspension of the running of interest only for the period from December 29, 1949, the date originally set for trial, to February 1, 1950, the date of the trial pursuant to the continuance.

Pursuant to the orders of August 7, 1950, Wells Fargo deposited the moneys claimed in both actions in the registry of the court on August 14, 1950. At that time, parties claiming adverse interests in the fund were before the court and Wells Fargo's position became akin to that of an interpleader and involuntary stakeholder who has divested himself of all claims to the fund and who is no longer enjoying any benefit therefrom.

In Bowman v. Wilson, C.C.W.D.Mo., 12 F. 864, the court stated: "It [interest] is never allowed where, by the order of a court of competent jurisdiction, or by the interposition of the law, * * * payment of a debt has been prevented. * * * If a fund is in the custody of the law—in the

possession of a court—and cannot be paid out without the order of such court, it does not ordinarily bear interest." See also, Fox v. Lofland, 3 Cir., 98 F.2d 589, 593, certiorari denied, Lofland v. Fox, 305 U.S. 658, 59 S.Ct. 359, 83 L.Ed. 427. The rule in California is similar. Calif.Civ.Code § 3287 provides as follows:

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, *except during such time as the debtor is prevented by law * * * from paying the debt.*" (Emphasis supplied.)

In California, it is considered well settled that where the debtor has been prevented from making a payment by a valid order of a court, there is no liability for interest. See Perkins v. Benguet Consolidated Mining Co., 55 Cal.App.2d 720, 769, 132 P.2d 70, and cases cited. Such is the case here. The deposits in court were lawful, having been made by leave of court and on notice to the claimants. Rule 67, Federal Rules of Civil Procedure. Once the deposit has been made, the money may not be withdrawn except upon order of the court. 28 U.S.C. § 2042. It therefore follows that interest upon the moneys ceased to run when they were deposited in the court on August 14, 1950, inasmuch as Wells Fargo was thereafter prevented by law and by court order from paying its obligations.

■■■ The Bank is entitled to interest from the time of the various demands up to the time of the deposit into court, excluding the period between December 29, 1949, and February 1, 1950. The rate of interest is that set by the laws of California, seven per cent. 2 Deerings California General Laws 1350, Act 3757, § 1. While it may be, as pointed out by Wells Fargo, that seven per cent is an unrealistic interest figure today, that

is a determination to be made by the legislature, not by the courts.

The district court directed that Wells Fargo be paid its out-of-pocket costs amounting to $240.63 plus $10,000.00 attorney's fees out of the moneys in the registry of the court. The court relied upon Rule 54(d), Federal Rules of Civil Procedure, which provides in part as follows:

"(d) Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs * * *."

The court reasoned that inasmuch as Wells Fargo was an innocent party caught between two conflicting claims to a fund in its possession, it should not be required to bear the cost of the ensuing litigation. It held that Rule 54(d) vests a discretionary power in the court with respect to the allowance of costs, including attorney's fees, and that the Rules of Decision Act, 28 U.S.C. § 1652, and Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, did not have the effect of making the state law on attorney's fees determinative.

■■■ In California, an interpleader may not recover his attorney's fees as part of his costs. Calif.CodeCiv.Proc. § 1021; Pacific Gas & Electric Co. v. Nakano, 12 Cal.2d 711, 87 P.2d 700, 121 A.L.R. 417. This rule is not determinative in diversity actions. Palomas Land and Cattle Co. v. Baldwin, 9 Cir., 189 F.2d 936. The allowance of costs, including attorney's fees, is a matter within the discretion of the trial court and will not be disturbed unless an abuse of that discretion is clearly shown. T. & M. Transportation Co. v. S. W. Shattuck Chemical Co., 10 Cir., 158 F.2d 909, 911; Mishawaka Rubber and Woolen Manufacturing Co. v. S. S. Kresge Co., 6 Cir., 119 F.2d 316, 326, reversed on other grounds 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381; cf. Mason v. Para-

dise Irrigation District, 9 Cir., 149 F.2d 334, affirmed 326 U.S. 536, 66 S.Ct. 290, 90 L.Ed. 287. There has been no showing made of such an abuse of discretion.

It is apparent from the opinion of the district judge that the total out-of-pocket costs and attorney's fees so allowed were attributable to the costs and services in both actions. See 104 F.Supp. 59, 67–68. The parties have not contended otherwise. However, the single document prepared by the court below was entered as the judgment in each action. In order to clear the record we shall exercise our power to dispose of the matter as may be just under the circumstances (see 28 U.S.C. § 2106) to reverse that part of the judgment relating to these costs and fees in one action so that it will not appear that the award was made in each action.

In appeal No. 13,412: The judgment is reversed insofar as it denies the Bank of China any interest; and the judgment is affirmed insofar as it directs that Wells Fargo Bank & Union Trust Co. be paid its out-of-pocket costs of $240.63 and attorney's fees of $10,000.-00 as costs out of the sum in the registry of the court. The cause is remanded to the district court with instructions to compute interest at seven per cent per annum on the following:

$600,000.00—from October 7, 1949, to December 29, 1949; and from February 1, 1950, to August 14, 1950;

$26,860.07—from November 9, 1949, to December 29, 1949; and from February 1, 1950, to August 14, 1950;
and to enter a judgment against the Wells Fargo Bank & Union Trust Co. and in favor of the Bank of China for the amount of interest so computed.

In appeal No. 13,413: The judgment is reversed insofar as it denies the Bank of China any interest; and reversed in-

sofar as it may be deemed to direct a duplication of the award of out-of-pocket costs and attorney's fees affirmed in No. 13,412. The cause is remanded to the district court with instructions to compute interest at seven per cent per annum on the following:

$171,724.57—from April 26, 1950, to August 14, 1950;

$2,500.00 from April 26, 1950, to April 29, 1950;
and to enter a judgment against the Wells Fargo Bank & Union Trust Co. and in favor of the Bank of China for the amount so computed.

HARRIS, District Judge (dissenting).

I cannot agree with the majority holding that the Wells Fargo be required to pay a substantial sum of interest to the Bank. The judgment of the trial court should be affirmed.

The allowance of interest is predicated upon the assertion that Wells Fargo "chose not to rely upon the protection offered by Section 953 of the California Financial Code." [1]

The record affirmatively shows that Wells Fargo did not have, nor could it exercise, a choice of either fact or law at the time the demand was made upon it. The code section referred to obviously could not afford any claimed protection, for the reason that it was designed and clearly intended to cover acts and conduct of only an agent or authorized person, as distinguished from the primary authority of the principal. The section is thus restricted by its plain terms.

The cases which have construed this section are distinguishable. They deal with specific agents who have acted without authorization or beyond the scope of their authority. Under such circumstances it has been held that a

---

1. "§ 953. Authorization of withdrawals by depositor. When the depositor of a commercial or savings account has authorized any person to make withdrawals from the account, the bank, in the absence of written notice otherwise, may assume that any check, receipt, or order of withdrawal drawn by such person in the authorized form or manner, including checks drawn to his personal order and withdrawal orders payable to him personally, was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person."

478

bank incurs no liability for honoring demands of previously authorized agents; nor need the bank inquire into the destination of the proceeds. Boston Insurance Co. v. Wells Fargo Bank, 80 Cal.App.2d 59, 181 P.2d 84.

The problem facing Wells Fargo at the time of the demand, as well as the complexities of fact and law confronting the trial court, centered on the issue of internal corporate authority, contested by rival claimants and rival attorneys.

The following chronology is important in following the sequence of events:

```
Demand made for $600,000..............October 7, 1949
Suit filed (Appeal No. 13412).........November 9, 1949
   (This action included an addi-
   tional sum of $26,860.07 and con-
   stitutes the demand for that
   amount)
Appellee's answer filed...............December 5, 1949
   (No extensions of time requested)
Motion for Summary Judgment
   Argued ...........................December 19, 1949
Trial Date ...........................December 29, 1949
Appellant's Request for Postpone-
   ment ..............................December 27, 1949
New Trial Date ......................February 1, 1950
Appearance of Rival Attorneys......January 26, 1950
```

Immediately after filing the first action, appellant moved for summary judgment. The District Court reserved ruling on the motion and ordered an early trial date. Thereafter, as indicated, appellant requested a postponement and a new trial date was indicated, to-wit February 1, 1950. However, before the matter came to trial a motion was filed on behalf of the Chinese Communists by a distinct and rival group of attorneys,[2] relying upon cabled instructions from Communist China, wherein it was sought to have the Complaint dismissed, or in the alternative, to substitute themselves as attorneys for the plaintiff. The basis of this claim was that the Communist government had succeeded by conquest to the rights in the Bank of China which

had theretofore belonged to the National Government.

The issues presented to the trial court were without analogous precedent. Upon review from its interim decision, D. C., 92 F.Supp. 920, this court observed, 9 Cir., 190 F.2d 1010, 1012: "In briefs and oral argument, the parties have made it clear that there is now available additional evidence of substantial significance. The District Court may deem it expedient to re-examine the case in the light of changing world conditions and such additional evidence as may be made available to it by the respective parties."

Upon remand, extensive proceedings were engaged in: Appellant renewed its motion for summary judgment. The group of attorneys purporting to represent the Chinese Communists renewed their motion to dismiss, and the Wells Fargo moved the court to allow costs and attorneys' fees. Upon the hearing of these motions appellant introduced new documentary evidence in support of its authority to represent the Bank of China. In the light of this new evidence and changing world conditions and after additional argument, Judge Goodman rendered his exhaustive opinion, D.C., 104 F.Supp. 59, that appellant had at last established its authority to act for the corporate depositor, and it was only then that the court granted the motion for summary judgment.

Such being the posture of the case, how can it be said that the representatives of Wells Fargo at the outset could have reached a decision outlining a safe course of conduct for the bank in the light of the high standards of care demanded? Ogborn v. Bank of America, 28 Cal.App.2d 565, 83 P.2d 44.

Absent specific statutory authority,[3] Wells Fargo adopted the only course of

---

2. Robert W. Kenny, Esq., Martin Popper, Esq., Benjamin Dreyfus, Esq., and Francis J. McTernan, Esq.

3. Subsequently, in 1951, the California Legislature enacted a specific statute to enable California banks to meet comparable situations. California Financial Code —Section 954:

"Recognition of claims to deposits of cash or securities of corporations or firms in occupied territory: 'Occupied territory': When section effective: Application of section. A bank need not recognize or give any effect to (1) any claim to a deposit of cash or securities standing on its books to the credit of, or held by it

conduct which was then available and acted neither capriciously nor arbitrarily. The jurisdiction of the United States District Court was immediately invoked and upon the entry of the interim order, the funds were deposited in the registry of the court.

In requiring Wells Fargo to pay interest, the majority opinion has misconceived the application of Section 953 of the California Financial Code. This section cannot be applied as a legal abstraction.

The factual, as well as legal, issues confronting Wells Fargo were real and substantial as vividly depicted by the trial court, D.C., 104 F.Supp. 59, 65, 67:

"This factual situation is without analogous precedent in any reported case. The resulting legal problem, arising as it does out of sweeping historical changes and the claims of rival governments, cannot be met by the application of technical rules of corporation law.

"A year and a half ago, this Court felt that the best course was to withhold judgment. At that time the Nationalist forces had only re-

cently retreated to their last stronghold; their ability to consolidate this position was doubtful. The Peoples Government which had assumed control of the Chinese Mainland had not yet demonstrated its stability. Our executive policy had not assumed definite outlines in the wake of these events. The émigré directors of the Bank who sought control of the deposit in suit could not demonstrate their authority to do so or their ability to apply the funds to corporate purposes. The Bank of China, under new management on the Chinese Mainland, was not yet functioning normally in accordance with its Articles of Association. Whether its assets there would be employed for corporate purposes or diverted to other ends was not known.

"Now time has clarified the picture. Both the Nationalist and Peoples Governments have maintained and strengthened their positions. Our national policy toward these governments is now definite. We have taken a stand adverse to the aims and ambitions of the Peoples

---

for the account of, any corporation, firm or association in occupied territory or (2) any advice, statute, rule or regulation purporting to cancel or to give notice of the cancellation of the authority of any person at the time appearing on the books of such bank as authorized to withdraw or otherwise dispose of cash or securities of such corporation, firm or association, unless such bank is required so to do by appropriate process procured against it in a court of competent jurisdiction in the United States in a cause therein instituted by or in the name of such corporation, firm or association, or unless the person making such claim or giving such advice or invoking such statute, rule or regulation, as the case may be, shall execute to such bank, in form and with sureties acceptable to it, a bond indemnifying it from any and all liability, loss, damage, costs and expenses for and on account of recognizing or giving any effect to such claim, advice, statute, rule or regulation.

"For the purposes of this section (1) the term 'occupied territory' shall mean territory occupied by a dominant author-

ity asserting governmental, military or police powers of any kind in such territory, but not recognized by the United States as the de jure government of such territory, and (2) the term 'corporation, firm or association in occupied territory' shall mean a corporation, firm or association which has, or at any time has had, a place of business in territory which has at any time been occupied territory.

"The provisions of this section shall be effective only in cases where (1) such claim or advice purports or appears to have been sent from or is reasonably believed to have been sent pursuant to orders originating in, such occupied territory during the period of occupation, or (2) such statute, rule or regulation appears to have emanated from such dominant authority and purports to be or to have been in force in such occupied territory during the period of occupation.

"This section applies to claims, advices, statutes, rules or regulations given or invoked either before or after the effective date of this section."

Government. The armed forces of that Government are now engaged in conflict with our forces in Korea. We recognize only the Nationalist Government as the representative of the State of China, and are actively assisting in developing its military forces in Formosa. The Bank of China now operates as two corporate entities, each performing within the area of its operations the functions bestowed upon the Bank of China by its Articles of Association. Each Bank of China is in a position to employ the deposit in suit for corporate purposes.

\*    \*    \*    \*    \*    \*

"There is no question but that defendant Bank should be relieved of all obligation to pay interest after the deposit was paid into court and the funds were no longer subject to the use of defendant. The legal issues raised by the conflicting claims of authority were real and substantial and their judicial determination was necessary to protect defendant Bank. Conner v. Bank of Bakersfield, 1920, 183 Cal. 199, 190 P. 801. During the period from the initial demand for payment of $600,000 on October 7, 1949 until August 14, 1950, the deposit remained subject to defendant's use. But the Court is of the opinion that the demand was legally insufficient, under the circumstances which then existed, to obligate the defendant Bank to make payment. Even up to the time that the deposit was paid into court, those who sought to receive payment on behalf of the Bank of China, as controlled by the Nationalist Government, had not demonstrated their authority to do so. In view of the confusion which then existed the defendant Bank could not properly have risked making payment to anyone without proof of their corporate authority. Since the Bank was under no obligation to pay interest prior to the demand, the circum-

stances do not warrant imposing such obligation upon it thereafter."

The trial court exercised a sound discretion in relieving Wells Fargo from any claimed liability for interest prior to deposit of the funds in the registry, pursuant to order of the trial court.

The account in question was a commercial account. It did not draw interest and there was no contract, either express or implied, on the part of Wells Fargo requiring the payment of any interest.

Interest is allowed by the majority in the nature of a penalty.

It is a recognized principle of law that a court has discretion to relieve an involuntary stakeholder from liability for interest on considerations of equity and justice. The California courts have likewise held that relief will be afforded an innocent stakeholder from liability for interest during the period before deposit of a disputed fund in court.

The lengthy legal contest waged before the trial court rendered it doubtful to whom the debt should be paid and the resolution of this judgment was not made until after an interim appeal to this Court. Under such circumstances it appears clearly inequitable to penalize the debtor.

A number of available remedies are suggested, any one of which it is claimed would have relieved Wells Fargo from the interest liability.

The several suggestions indicated by the majority, were apparently considered by Wells Fargo and found to be either inapplicable or inappropriate in the light of the unusual facts. In addition, it should be observed that the case of Republic of China v. American Express Co., 2 Cir., 195 F.2d 230, had not been decided by the Appellate Court at the time Wells Fargo was obliged to institute its action.

There are several distinguishing features concerning the case, one of which is that it dealt with the Republic of China and Directorate General of Postal

Remittances and Savings Bank. The Bank of China, as such in the case at bar, is a corporate entity—it is not the Government of China. Obviously, recognition may have a different significance where a corporation is concerned.

Considerations of justice require that the judgment of the trial court be affirmed.